**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **SEIBERT**, *et al.*,<br><br>     **Plaintiffs,**<br><br>  **v.**<br><br>**NOKIA OF AMERICA CORPORATION**, *et al.*,<br><br>     **Defendants.** | **Civil Action No. 21-20478 (ES) (AME)**<br><br>**OPINION** |

**SALAS, DISTRICT JUDGE**

  Plaintiffs Paul Seibert, Thomas Solury, Dana Molineaux, Henry Worcester, Stephanie Schnepp, John Strong, Jr., and Scott Allen (together "Plaintiffs") filed this putative class action bringing claims for breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* against Defendants Nokia of America Corporation ("Nokia"), the Board of Directors of Nokia (the "Board"), and the Nokia 401(k) Committee (the "Committee") (together "Defendants").[1]  (D.E. No. 1 ("Complaint" or "Compl.")).  Before the Court is Defendants' motion to dismiss the Complaint.  (D.E. No. 20).  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the following reasons, Defendants' motion is **GRANTED-in-part** and **DENIED-in-part**.

---

[1] The class period is defined in the Complaint as December 13, 2015, through the date of judgment (the "Class Period").  (Compl. ¶ 38).  As alleged in the Complaint, prior to 2017 Alcatel-Lucent was the plan sponsor and subsequent to 2017 Nokia was the plan sponsor.  (*Id.* ¶ 1 n.2).  Further, prior to 2016 the Board allegedly may have been known as the Board of Directors of Alcatel-Lucent USA.  (*Id.* ¶ 1 n.3).  Finally, the Committee was formerly known as the Alcatel-Lucent 401(k) Committee.  (*Id.* ¶ 1 n.4).  After January 1, 2017, it was changed to the Nokia 401(k) Committee.  (*Id.*).  Accordingly, the Court construes the Defendants to include their Alcatel-Lucent counterparts.

I.      BACKGROUND

A.      Factual Allegations

As alleged in the Complaint, Plaintiffs are participants of the Nokia Savings/401(k) Plan (the "Plan")[2] who invested in options offered by the Plan.  (Compl. at 1; *id.* ¶¶ 17–24 & 45).  The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), "in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account."  (*Id.* ¶ 46).  The Plan here is vast.  According to the Complaint, the Plan had at least $6.3 billion dollars in assets under management at all times during the Class Period and had over 29,000 participants as of the end of 2020.  (*Id.* ¶¶ 9 & 39).

Defendant Nokia, is the Plan sponsor.  (*Id.* ¶ 26).  Plaintiffs allege that Nokia, acting through the Board, appointed the Committee to, among other things, "ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers."  (*Id.* ¶ 30).  The Complaint alleges that, pursuant to the Plan document, the Committee had full discretionary authority to determine the number and type of investment options administered by the Plan.  (*Id.* ¶ 34).

The Plan is governed under ERISA, and Plaintiffs claim that Defendants are fiduciaries of the Plan and breached their ERISA-imposed fiduciary duties in several ways.  First, Plaintiffs claim that the Committee breached its fiduciary duty of prudence by failing to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent in

_____

[2]      As alleged in the Complaint, prior to 2016 the Plan was known as the Alcatel-Lucent/401(k) Plan but was changed to its current name after 2016.  (Compl. at 1 n.1).  Accordingly, the Court construes the "Plan" to include both the "Alcatel-Lucent/401(k) Plan" and the "Nokia Savings/401(k) Plan" since Plaintiffs allege that the Class Period is defined as December 13, 2015, through the date of judgment.  (*Id.* ¶ 38).

terms of cost and management fees. (*Id.* ¶¶ 11 & 64). This alleged breach resulted in several funds in the Plan being more expensive than comparable funds found in similarly-sized plans with more than $1 billion in assets. (*Id.* ¶ 64). According to the Complaint, each of the funds offered by the Plan has an associated cost, including for investment management. (*Id.*). Plan participants pay for costs associated with each fund "via the fund's expense ratio, evidenced by a percentage of assets." (*Id.* ¶ 65). For example, "an expense ratio of .75% means that a plan participant will pay $7.50 for every $1,000 in assets." (*Id.*). Because the expense ratio reduces the participant's return, Plaintiffs allege that prudent plan fiduciaries must consider the effect expense ratios have on investment returns. (*Id.*). Plaintiffs identity seventeen funds offered by the Plan that they allege had excessively high expense ratios. (*Id.* ¶¶ 69–70). Plaintiffs compare these expense ratios to median and average costs of funds according to a study conducted by the Investment Company Institute ("ICI") and argue that the expense ratios are "excessively high" when compared to the ICI Medians and ICI Averages. (*Id.*). Plaintiffs further allege that though the Plan's funds, which are pooled separate accounts, should have been less expensive than their mutual fund counterparts, they were much more expensive. (*Id.* ¶ 71). According to the Complaint, these excessively high costs are circumstantial evidence that the Plan was managed imprudently. (*Id.* ¶ 72).

Second, Plaintiffs allege that the Committee breached its fiduciary duty of prudence by subjecting the Plan to excessive recordkeeping and administrative costs. (*Id.* ¶ 73). "Recordkeeping" refers to the "suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper.'" (*Id.* ¶ 74). According to the Complaint, recordkeeping services are generally provided as a bundle at a per-capita price—regardless of whether a plan makes use of all of the services—or à la carte for an additional cost based on the usage of the services by individual participants. (*Id.* ¶¶ 75–77). Plaintiffs allege that the price for

recordkeeping often "depends on the number of participants" in a plan, and because of "economies of scale," large plans can negotiate lower per-participant recordkeeping fees.  (*Id.* ¶ 79).  Plaintiffs further claim that recordkeeping services "can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing."  (*Id.* ¶ 80).  While the Complaint alleges that revenue sharing is not *per se* imprudent, "unchecked, it is devastating for Plan participants" because it is a way to hide fees.  (*Id.* ¶ 81).

To show that the Plan's recordkeeping and administrative fees were excessive, Plaintiffs compare its fees to those of other plans.  (*Id.* ¶ 93).  From 2015 to 2020, Plaintiffs allege that the Plan's per participant administrative and recordkeeping fees ranged from $76.59 to $116.26, which they characterize as "astronomical."  (*Id.* ¶¶ 87–88).  Plaintiffs allege that the per participant fees in seven other comparable plans with at least 30,000 participants and $3 billion in assets show fees in the range of $21 to $34 per participant in 2019.  (*Id.* ¶ 93).  Plaintiffs also provide data from a 2020 report by a consulting group called NEPC that found that the majority of plans with over 15,000 participants paid under $40 per participant in recordkeeping, trust and custody fees.  (*Id.* ¶¶ 91–92).  In addition, Plaintiffs allege that fiduciaries should remain informed about overall trends in the recordkeeping fee marketplace by conducting a Request for Proposal ("RFP") at "reasonable intervals" to determine if a plan's recordkeeping and administrative expenses appear high in relation to the general marketplace.  (*Id.* ¶¶ 84–85).  Because the Plan paid yearly amounts in recordkeeping fees that increased each year, Plaintiffs allege that there is "little to suggest" that the Committee conducted an RFP at reasonable intervals, "or certainly at any time prior to 2015 through the present."  (*Id.* ¶ 85).  Instead, Plaintiffs allege that the Plan stuck with a recordkeeping charge to participants based on the Plan's total assets—causing the per participant charge to increase each year as the assets of the Plan increased—even though the number of participants in

the Plan remained relatively unchanged.  (*Id.* ¶¶ 86–88).  Plaintiffs allege that such an asset-based approach made little sense given that recordkeeping expenses are driven by the number of participants in a plan and the vast majority of plans are charged on a per-participant basis.  (*Id.* ¶¶ 79 & 86).  Further, Plaintiffs allege that in this matter using a combination of an asset-based fee with revenue sharing "resulted in a worst-case scenario for the Plan's participants because it saddled [them] with above-market recordkeeping fees."  (*Id.* ¶ 83).  According to the Complaint, these excessive recordkeeping and administrative costs are circumstantial evidence that the Plan was managed imprudently.  (*Id.* ¶ 95).

### B.    Procedural History

Plaintiffs initiated this putative class action on December 13, 2021, on behalf of themselves and "[a]ll persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 13, 2015 through the date of judgment."  (*Id.* ¶ 38).  The Complaint asserts two counts against (i) the Committee for breach of fiduciary duties of prudence ("Count I"); and (ii) Nokia and the Board for failure to adequately monitor other fiduciaries ("Count II").  (*Id.* ¶¶ 96–110).  More specifically, in Count I, Plaintiffs allege that the Committee and its members breached their fiduciary duty of prudence in violation of 29 U.S.C. § 1104(a)(1) by (i) failing to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost, and (ii) subjecting the Plan to excessive recordkeeping and administrative costs.  (*Id.* ¶¶ 11 & 96–103).  In Count II, Plaintiffs allege that Nokia and its Board breached their fiduciary duties by failing to monitor the Committee to ensure it avoided those same excessive fees and costs.  (*Id.* ¶¶ 104–110).  On July 28, 2022, Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), challenging the sufficiency of Plaintiffs' allegations supporting all counts.  (D.E. No. 20-

1 ("Mov. Br.")).  The motion is fully briefed.  (D.E. No. 21 ("Opp. Br."); D.E. No. 22 ("Reply")).

Since the filing of Defendants' motion, the parties have also submitted supplemental notices of

authority addressing similar allegations.  (D.E. Nos. 23–25, 28–31, 33, 35–36, 38–40, 43–44, 46,

48 & 50–53).

## II.    LEGAL STANDARD

In assessing whether a complaint states a cause of action sufficient to survive dismissal

under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all

reasonable inferences in favor of the plaintiff."  *City of Cambridge Ret. Sys. v. Altisource Asset*

*Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "[T]hreadbare recitals of the elements of a cause

of action, legal conclusions, and conclusory statements" are all disregarded.  *Id.* at 878–79 (quoting

*James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The complaint must "contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"

and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Zuber v.*

*Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d

121, 128 (3d Cir. 2010); then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "In evaluating

a motion to dismiss, [courts] may consider documents that are attached to or submitted with the

complaint, and any 'matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"

*Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (second alteration in original)

(citation omitted) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice &*

*Procedure* § 1357 (3d ed. 2004)).

## III.     DISCUSSION

A claim for a breach of fiduciary duty has three elements: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), *as amended* (Dec. 21, 2007).  With respect to the second prong, which is the central dispute of Plaintiffs' claims, ERISA imposes a duty of prudence.  *See* § 1104(a)(1)(B).  The Court will address Plaintiffs' claims for breach of the duty of prudence in Count I as well as Plaintiffs' failure to monitor claim in Count II.

### A.       Breach of Duty of Prudence

ERISA fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings.  The law expects more than good intentions.  '[A] pure heart and an empty head are not enough.'"  *Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019) (alteration in original) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)).  In assessing this duty, a court must look at the process rather than the results.  *Id.*  Hindsight indeed is 20/20, so the focus must be "on a fiduciary's conduct in arriving at [a] . . . decision."  *Id.* (alteration in original) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).  A court should ask "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [course of action]."  *Id.* (quoting *Unisys*, 74 F.3d at 434).  At the pleading stage, however, factual allegations do not have to "directly address[] the process by which the [p]lan was managed."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009).  A plaintiff's allegations are sufficient if a court can reasonably infer that "the

process was flawed." *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) (quoting *Braden*, 588 F.3d at 596).  Such allegations may include the "reasonableness of fees" and "practices of similarly situated fiduciaries."  *Sweda*, 923 F.3d at 331.  "Because the content of the duty of prudence turns on the circumstances . . . prevailing at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific" and "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) (internal quotation omitted).

### i.   Excessive Expense Ratios

Plaintiffs claim that the Committee breached its fiduciary duty of prudence by failing to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent in terms of cost and investment management fees.  (Compl. ¶¶ 11 & 64).  More specifically, Plaintiffs allege that the Plan was managed imprudently because the expense ratios charged by seventeen of the Plan's funds were excessive.  (*Id.* ¶¶ 58–72).  To support their claim, Plaintiffs compare the expense ratios of seventeen of the Plan's funds to median and average expense ratios of similarly-sized plans according to an ICI study.  (*Id.* ¶¶ 69–70).  Plaintiffs claim that the Committee "could not have engaged in a prudent process as it relates to evaluating investment management fees" because of the "excessively high expense ratios" charged by the funds compared to the plans identified by the ICI study.  (*Id.* ¶¶ 68–70).  Defendants move to dismiss this claim, arguing (among other things) that the ICI study does not constitute a meaningful benchmark for purposes of comparing the costs of the Plan's funds.  (Mov. Br. at 14–21).  Plaintiffs oppose and contend that they have plausibly alleged a breach of the duty of prudence because the ICI study provides a useful benchmark.  (Opp. Br. at 12–17).  In addition, Plaintiffs argue that whether the ICI study is a meaningful comparator is a question that should not be evaluated on a

motion to dismiss.  (*Id.* at 17–19).  For the reasons set forth below, the Court agrees with Defendants.

To determine whether a fiduciary breached its duty of prudence, courts look to "process rather than results" and will consider "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  *Sweda*, 923 F.3d at 329 (internal quotation omitted).  "To survive a motion to dismiss, however, Plaintiffs need not 'directly allege how [Defendants] mismanaged the Plan,' so long as there is 'substantial circumstantial evidence' to permit the Court to 'reasonably infer that a breach had occurred.'"  *Cho v. Prudential Ins. Co. of Am.*, No. 19-19886, 2021 WL 4438186, at *7 (D.N.J. Sept. 27, 2021) (quoting *Silva v. Evonik Corp.*, No. 20-2202, 2020 WL 12574912, at *5 (D.N.J. Dec. 30, 2020)).  Nonetheless, "Plaintiffs who rely on 'circumstantial evidence must . . . provide a sound basis for comparison—a meaningful benchmark—to show a prudent fiduciary in like circumstances would have selected a different fund.'"  *Id.* (quoting *Silva*, 2020 WL 12574912, at *5).  A plaintiff does not adequately plead a breach of the fiduciary duty of prudence merely by alleging that cheaper alternative investments with some similarities exist in the marketplace.  *Id.* at *8–9.

Here, the Complaint does not sufficiently allege that the Committee breached its duty of prudence by failing to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost.  To support their claim, Plaintiffs compare the expense ratios of seventeen of the Plan's funds, which they allege were excessively high, with median and average expense ratios of funds in "similarly-sized plans" bearing similar investment styles according to an ICI study.  (Compl. ¶¶ 69–70).

*First*, the ICI study does not constitute a meaningful benchmark and is insufficient to plausibly allege that the Committee's review of the Plan's investment portfolio was imprudent.

As Defendants point out (Mov. Br. at 15–18), rather than pointing to the expense ratios paid by specific and similarly-situated investment options in other plans as a basis for comparison, the Complaint only compares the expense ratios of the Plan's funds with the median and average costs of funds in "similarly-sized plans," defined by high-level investment style groupings.  (*Id.* ¶¶ 68–70; *see, e.g., id.* ¶ 69 (comparing expense ratio of Plan's High Yield Bond Fund with the ICI median expense ratio for funds with an investment style of Domestic Bond)).  However, Plaintiffs do not allege what funds are included in these median and average calculations broken down by investment style, or how those funds compare with the Plan's funds.  *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281–82 (8th Cir. 2022) (finding that the plaintiffs did not plausibly allege an investment duty of prudence claim by comparing expense ratios of the plan's funds with average and median expense ratios in their groups because "[t]here is no way to compare the large universe of funds—about which we know little—to the risk profiles, return objectives, and management approaches of the funds" in the plan).  In effect, Plaintiffs have done little more here than allege that cheaper alternative investments existed in the marketplace.  This is not sufficient to adequately plead a claim for breach of the duty of prudence.  *Cho*, 2021 WL 4438186, at *8–9 (finding that the plaintiff failed to plausibly allege that defendants' selection and retention of challenged funds was imprudent where plaintiff compared each of the plan's challenged funds to a single corresponding fund with a "similar investment style" to show that the defendants charged excessive fees, because a "[p]laintiff does not adequately plead a claim merely by alleging that 'cheaper alternative[] investments exist in the marketplace.'" (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018))).  As such, these allegations are insufficient to withstand a motion to dismiss.

*Second*, the fact that the Plan's funds charged an expense ratio higher than certain averages and medians does not, by itself, suggest that the fund's costs are excessive. As Defendants point out, if such were the case, then by definition half of all funds would be charging excessive fees. (Mov. Br. at 19–20). Rather, as the Supreme Court has emphasized, a court evaluating whether a plaintiff has plausibly alleged a breach of the duty of prudence must undertake a "context-specific" inquiry. *Hughes*, 142 S. Ct. at 742 (internal quotation omitted). Plaintiffs do not offer any other context to support their claim that the Plan's funds were managed imprudently beyond their allegation that the seventeen challenged funds had higher expense ratios as compared to third-party median and average expense ratios for funds with certain investment styles. Plaintiffs do not allege what funds are included in these median and average calculations broken down by investment style groupings. Nor do Plaintiffs mention anything about the performance of the challenged funds. (*See generally* Compl.). Such context is important, however, given that a prudent fiduciary might decide to include funds with higher costs in a plan if those funds are likely to produce higher returns. *See, e.g.*, *Hughes*, 142 S. Ct. at 742 ("Because the content of the duty of prudence turns on the circumstances . . . prevailing at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific"); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1165 (6th Cir. 2022) ("[T]here is nothing wrong with permitting employees to choose [more expensive options] in hopes of realizing above-average returns over the course of the long lifespan of a retirement account."); *Rodriguez v. Hy-Vee, Inc.*, No. 22-0072, 2022 WL 16648825, at *6 (S.D. Iowa Oct. 21, 2022) ("In their Complaint, Plaintiffs do not mention anything about the performance of the seven funds, instead focusing entirely on fees. This is a notable omission, as a prudent fiduciary reasonably might decide to include higher-fee options in the menu of choices for plan participants if those options were reasonably likely to produce higher returns."). Instead,

11

Plaintiffs allege only that the offered funds in the Plan were more expensive than other funds.  And as stated already, a plaintiff does not adequately plead a claim for breach of the duty of prudence merely by alleging that cheaper alternative investments with some similarities exist in the marketplace.  *Cho*, 2021 WL 4438186, at *8–9.  Without additional facts to show other indicia of imprudence, Plaintiffs have not plausibly alleged that the Committee breached its duty of prudence by failing to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and investment management fees.

Plaintiffs' arguments to the contrary are unavailing.  To start, Plaintiffs argue that there is no one-size-fits-all approach to picking appropriate benchmarks, and here the large deviations (as much as 364% in some instances) between the expense ratios of the funds offered by the Plan as compared to the medians and averages of other funds in the ICI study are sufficient to allege imprudence.  (Opp. Br. at 12–14).  Further, Plaintiffs contend that Defendants' arguments regarding their choice of comparators raise issues of fact that require assessment on a more developed record.  (*Id*. at 17–19).  The Court disagrees.  While there may indeed be no one-size-fits-all approach to choosing appropriate benchmarks, to survive a motion to dismiss, Plaintiffs who rely on circumstantial evidence in raising a duty of prudence claim must nevertheless "provide a sound basis for comparison" to show a prudent fiduciary in "like circumstances" would have acted differently.  *Compare Cho*, 2021 WL 4438186, at *7–9 (granting motion to dismiss where the plaintiff failed to offer any meaningful benchmark), *with Sweda*, 923 F.3d at 332 (finding that the plaintiffs stated a claim where the plaintiff offered "*specific comparisons* between returns on [p]lan investment options and readily available alternatives, as well as practices of *similarly situated fiduciaries* to show what plan administrators 'acting in a like capacity and familiar with such matters would [do] in the conduct of an enterprise of a *like character and with like aims*.'"

(emphasis added) (quoting 29 U.S.C. § 1104(a)(1)(B))).  And as described above, here, Plaintiffs have failed to provide comparisons with the practices of similarly situated fiduciaries by relying on an ICI study that does not specify the funds captured in the aggregate median and average investment style groupings.

Finally, Plaintiffs contend that notwithstanding Defendants' criticism of the use of the ICI medians and averages as an appropriate benchmark, other courts in the Third Circuit have upheld claims based on this same benchmark.  (Opp. Br. at 14–15).  The Court, however, finds these cases distinguishable.  Plaintiffs first cite to *Silva*, 2020 WL 12574912, at *5–6, for support, where the court found that the plaintiffs had plausibly alleged a breach of the duty of prudence due to the defendants' failure to investigate or select investments with lower expenses.  While the plaintiffs in *Silva* alleged that the funds in the plan charged higher-than-average fees with reference to medians published by the ICI study, they also set forth allegations that (i) "the Plan offered mutual funds in a higher cost share class, despite the availability of lower cost share mutual funds that were identical in every way except for their lower cost"; (ii) "[d]efendant[]s failed to investigate the availability of collective trusts or separate accounts, which are materially similar but cheaper alternatives to the mutual funds in the Plan;" and (iii) "the Plan maintained three actively managed funds, despite the comparable returns and lower costs offered by passively managed funds."  *Id.* at *5 (internal quotation omitted).  No such additional allegations are present here.  And as discussed above, Plaintiffs do not allege anything about the performance of the challenged funds or the similarities between the challenged funds and the funds in the ICI study.  Likewise, in *Pinnell v. Teva Pharms. USA, Inc.*, No. 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020), though the plaintiffs alleged that the funds in the plan had higher expense ratios as compared to median fees in the same investment category group, the plaintiffs also alleged that the challenged

funds were overpriced as compared to specific identical but lower-cost alternatives.  *Pinnell*, 2020 WL 1531870, at \*5.  Again, no such additional allegations are present here.[3]

Accordingly, Plaintiffs' claim for breach of the fiduciary duty of prudence regarding the Committee's failure to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost is **DISMISSED**.  However, it is dismissed *without prejudice*.[4]  The Court cannot rule out the possibility that Plaintiffs might plausibly allege additional facts to show that the Committee breached its duty of prudence by failing to adequately review the Plan's investment portfolio with due care.

## ii. Recordkeeping and Administrative Fees

Plaintiffs claim that the Committee breached its fiduciary duty of prudence by subjecting the Plan to excessive recordkeeping and administrative costs.  (Compl. ¶ 73).  Defendants move to dismiss this claim, arguing that Plaintiffs have improperly focused on recordkeeping and administrative costs in isolation without taking the services provided by the Plan or comparator plans into consideration.  (Mov. Br. at 24–26).  Further, Defendants contend that Plaintiffs have

---

[3]      Plaintiffs' other cited cases do not support a contrary conclusion.  For example, in *Bouvy v. Analog Devices, Inc.*, No. 19-0881, 2020 WL 3448385, at \*2, \*9 (S.D. Cal. June 24, 2020), while the plaintiff alleged that "the Plan's investment expenses were higher than industry averages," he also alleged "specific examples of funds that underperformed their peers" and "concrete examples of cheaper better performing funds."  *Bouvy*, 2020 WL 3448385, at \*2, \*9.  Similarly, in *Davis v. Magna Int'l of Am., Inc.*, No. 20-11260, 2021 WL 1212579, at \*7 (E.D. Mich. Mar. 31, 2021), while the plaintiffs alleged that the plan's investment expenses were higher than industry averages they also alleged that the investment committee should have selected lower-cost share classes of mutual funds where available.  *Davis*, 2021 WL 1212579, at \*7; *see also McCool v. AHS Mgmt. Co., Inc.*, No. 19-1158, 2021 WL 826756, at \*5 (M.D. Tenn. Mar. 4, 2021) (upholding duty of prudence allegations where "[p]laintiffs allege[d] that the [p]lan failed to switch to identical lower-fee share class mutual funds, maintained expensive actively managed mutual funds, and failed to make any significant changes to the funds for the entire class period"); *In re Sutter Health ERISA Litig.*, No. 20-1007, 2023 WL 1868865, at \*8–9 (E.D. Cal. Feb. 9, 2023) (upholding duty of prudence allegations where the plaintiffs included allegations that the funds had high expense ratios and also consistently underperformed in relation to other options); *Stengl v. L3Harris Technologies, Inc.*, 22-0572, at 22 (M.D. Fla. Mar. 24, 2023) (noting that while the ICI study "piques the Court's interest" it cannot by itself carry the day at the motion to dismiss stage).  No such additional allegations are present here.

[4]      Because the Court dismisses Plaintiffs' claim regarding the Committee's failure to adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost, the Court will not consider Defendants' remaining arguments with respect to this claim.  (Mov. Br. at 20–22).

failed to state a claim because their calculations of the allegedly excessive recordkeeping fees are based on demonstrably false facts.  (*Id.* at 27–29).  Plaintiffs oppose and contend that they have plausibly alleged a breach of the duty of prudence regarding excessive recordkeeping and administrative fees because they have provided the Court with adequate comparators.  (Opp. Br. at 21–22).  In addition, Plaintiffs argue that their fee estimates are well-pled and to the extent they made any errors of fact, it was due to Plaintiffs' lack of access to accurate Plan data.  (*Id.* at 22–24).  For the reasons set forth below, the Court agrees with Plaintiffs.

Encompassed within the duty of prudence is that fiduciaries must "understand and monitor plan expenses."  *Sweda*, 923 F.3d at 328.  "'Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees."  *Id.* (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015)).  Accordingly, "fiduciaries should be vigilant in 'negotiation of the specific formula and methodology' by which fee payments such as 'revenue sharing will be credited to the plan and paid back to the plan or to plan service providers.'"  *Id.* (quoting DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4 (hereinafter DOL Advisory Opinion)).

In *Sweda*, the Third Circuit held that the plaintiffs plausibly alleged a breach of the duty of prudence regarding excessive administrative and recordkeeping fees, where the plaintiffs alleged that (i) the plan paid fees that were higher than those paid by similar plans for the same services; (ii) fees went up as assets grew despite there being no corresponding increase in services; (iii) the defendants failed to negotiate a cap on fees or solicit competitive bids for recordkeeping fees, despite the fact that similarly situated fiduciaries had taken such actions; and (iv) the defendants failed to review plan management and leverage the plan's size to obtain lower fees or rebates.  *Id.*

at 330–31.  The Third Circuit found these allegations sufficient because the plaintiffs provided "specific comparisons" between the fiduciary's choices and available alternatives to show that the "practices of similarly situated fiduciaries" for the "same services" differed.  *Id.* at 330–32.  In keeping with that decision, courts in this Circuit evaluating a claim for excessive fees will consider whether the plan engaged in competitive bidding for recordkeeping services, the plan's ability to leverage its size to reduce fees, and whether the complaint includes "a sound basis for comparison [or] meaningful benchmark" to show that the "practices of similarly situated fiduciaries" for the same services differed.  *Pinnell*, 2020 WL 1531870, at *3–4 (internal quotation omitted).  "A high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated 'relative to the services rendered.'"  *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1132 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)).  Accordingly, allegations that include a meaningful benchmark are those that plead that similarly situated plans received the same services for less.  *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 20-1493, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021).

Bearing in mind the necessarily fact-intensive inquiry of this claim, Plaintiffs have sufficiently alleged fiduciary breach with respect to the allegedly excessive recordkeeping and administrative fees.  Plaintiffs allege, and the Court accepts as true, that the Plan paid unreasonably high administrative and recordkeeping fees of $76.59 to $116.26 per participant from the years of 2015 to 2020.  (Compl. ¶ 87).  Plaintiffs also allege that recordkeeping and administrative fees increased as the assets of the Plan increased, despite the fact that the number of participants remained relatively unchanged from 2015 to 2020.  (*Id.* ¶ 88).  Further to demonstrate that the Plan's recordkeeping and administrative fees were excessive, Plaintiffs allege that the per

16

participant fees for seven other plans with more than 30,000 participants and more than $3 billion in assets under management show fees in the range of $21 to $34 per participant in 2019.  (*Id.* ¶ 93).  They also point to a report from consulting group NEPC that found that the majority of plans with over 15,000 participants paid under $40 per participant in recordkeeping, trust and custody fees, as well as case law to show that large plans can bargain for low recordkeeping fees.  (*Id.* ¶¶ 92 & 94 n. 15).   In addition, Plaintiffs allege that because the Plan paid yearly amounts in recordkeeping fees that increased each year over the Class Period, there is little to suggest that the Committee conducted an RFP to determine if recordkeeping and administrative expenses of the Plan were high in relation to the general marketplace, as a prudent fiduciary should do.  (*Id.* ¶¶ 84–85).  Accordingly, Plaintiffs allege that "[g]iven the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost."  (*Id.* ¶ 95).  Considering these facts in combination, Plaintiffs sufficiently plead that the Committee breached its duty of prudence under § 1104(a)(1)(B) under the circumstances then prevailing.[5]

Defendants' arguments to the contrary are unavailing.  *First*, Defendants argue that Plaintiffs have failed to allege that the recordkeeping and administrative fees paid by the Plan were excessive *relative to the services being rendered*.  (Mov. Br. at 24–26).  More specifically, Defendants contend that the Complaint fixates only on the purported *amount* of recordkeeping and administrative fees paid by the Plan versus comparator plans without offering any allegations about

---

[5]      While Defendants contend that other cases have held that the NEPC report is not an appropriate benchmark (D.E. No. 39 at 3), here the Court finds that Plaintiffs have sufficiently pled that the Committee breached its duty of prudence regarding excessive recordkeeping and administrative fees based on the consideration of all these facts in combination.

the scope or caliber of *services* being provided by the Plan or comparator plans in exchange for those fees.  (*Id.* at 24–26; Reply at 8–10).  Without such context, Defendants contend that the Complaint fails to state a plausible claim of imprudence.  (Mov. Br. at 26).

Though this issue is close, the Court finds that Plaintiffs have stated a claim for fiduciary breach of the duty of prudence with respect to the allegedly excessive recordkeeping and administrative fees.  While Defendants argue that Plaintiffs have failed to offer allegations about the scope or caliber of *services* being provided by the Plan or comparator plans, the Court disagrees.  Plaintiffs' Complaint alleges that there are two types of recordkeeping services provided by all national recordkeepers, including bundled and à la carte services, for large plans "with substantial bargaining power (like the Plan)."  (Compl. ¶ 75).  Further, the Complaint alleges that the bundled services "chosen by a large plan do not affect the amount charged by recordkeepers for such basic and *fungible* services."  (*Id.* ¶ 76 (emphasis added)).  Likewise, the Complaint alleges that "[a]ll national recordkeepers have the capability to provide" bundled and à la carte services "at very little cost to all large defined contribution plans, including those much smaller than the Plan."  (*Id.* ¶ 78).  And the Complaint alleges what bundled and à la carte services typically include.  (*Id.* ¶¶ 75 & 77).  Further, Plaintiffs allege that "the market for recordkeeping is highly competitive, with many vendors *equally* capable of providing a high-level service."  (*Id.* ¶ 85 (emphasis added)).  Finally, the Complaint alleges that "[g]iven the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan *could have obtained recordkeeping services that were comparable to or superior to the typical services* provided by the Plan's recordkeeper at a lower cost."  (*Id.* ¶ 95 (emphasis added)).  Though it may prove to be the case at summary judgment that the recordkeeper for the Plan specifically provided a broader

range of services than comparator plans, thus justifying higher fees, at this stage the Court must accept as true the Complaint's allegation that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the Committee failed to use its bargaining power to obtain services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  Those allegations—when combined with other allegations regarding the Plan's increasing recordkeeping and administrative costs from year to year despite the fact that the number of participants remained relatively unchanged, the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Committee's failure to conduct an RFP in a competitive recordkeeping market, and the Committee's failure to leverage the size of the Plan to obtain lower fees—are enough to support a reasonable inference of imprudence, notwithstanding Defendants' argument that Plaintiffs should have provided more specificity about the recordkeeping services provided to the Plan versus the comparators.  *See Sweda*, 923 F.3d at 331 ("The complaint should not be 'parsed piece by piece to determine whether each allegation, in isolation, is plausible.'" (quoting *Braden*, 588 F.3d at 594)); *Silva*, 2020 WL 12574912, at *8 (finding that the plaintiffs stated a claim for excessive recordkeeping fees where plaintiffs "alleged that nearly all recordkeepers in the marketplace perform the same core group of services"); *Hughes v. Nw. Univ.*, 63 F.4th 615, 632 (7th Cir. Mar. 23, 2023) (finding that the plaintiffs stated a claim for excessive recordkeeping fees in part where plaintiffs alleged that "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the [p]lans" and that recordkeeping services are fungible and the market for them is competitive); *Berkelhammer v. Automatic Data Processing, Inc.*, No. 20-5696, 2022 WL 3593975, at * 4–5 (D.N.J. Aug. 23, 2022)*; Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 20-01493, 2022 WL 973581, at *6 (W.D. Pa. Mar. 31, 2022);

19

*Rodriguez*, 2022 WL 16648825, at *11; *Brown v. MITRE Corp.*, No. 22-10976, 2023 WL 2383772, at *5 (D. Mass. Mar. 6, 2023).

Defendants cite to out-of-Circuit cases to support their argument that Plaintiffs have failed to adequately allege that the recordkeeping and administrative fees paid by the Plan were excessive *relative to the services being rendered*. (Reply at 8–9; D.E. No. 23; D.E. No. 28). The Court, however, finds these cases distinguishable. Defendants first cite *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022), where the Sixth Circuit upheld the dismissal of the plaintiff's recordkeeping fee claim because the complaint failed to allege that the fees were excessive relative to the services rendered. *Smith*, 37 F.4th at 1169. However, in *Smith*, the plaintiff alleged that the plan's recordkeeping fees were too high based on industry average costs for smaller plans and set forth no allegations that the services the plan's recordkeeper "covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites." *Id.* In contrast, here, Plaintiffs allege that the Plan's recordkeeping and administrative fees were excessive in relation to seven *specific* plans of a similar size. (Compl. ¶ 93). Further, Plaintiffs plausibly allege that there are two types of recordkeeping services provided by all national recordkeepers—including bundled "fungible" services and à la carte services—for large plans and that the Plan failed to obtain services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. (*Id.* ¶¶ 75–78 & 95). Plaintiffs also include facts regarding the Plan's increasing recordkeeping and administrative costs from year to year despite the fact that the number of participants remained relatively unchanged, the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Committee's failure to conduct an RFP, and the Committee's failure to leverage the size of the Plan to obtain lower fees. (*Id.* ¶¶ 84–95). Accordingly, the Court finds *Smith* distinguishable.

20

Also distinguishable is *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022), where the Seventh Circuit concluded that the plaintiff failed to allege an excessive recordkeeping claim because the plaintiff compared the recordkeeping fees of the plan with nine other plans but did not allege that the recordkeeping fees were excessive relative to the services rendered.  *Albert v. Oshkosh Corp.*, 47 F.4th 570, 580 (7th Cir. 2022).  In *Albert*, the plaintiff does not appear to have alleged—as Plaintiffs have alleged here—that there are two types of recordkeeping services provided by all national recordkeepers for large plans, and that the Committee failed to use its bargaining power to obtain comparable services at a lower cost.  And the *Albert* court did state that "recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss" should it "provide 'the kind of context that could move this claim from possibility to plausibility.'"  *Albert*, 47 F.4th at 580 (first quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014); then quoting *Smith*, 37 F.4th at 1169).  In *Hughes*, the Seventh Circuit found that plaintiffs had survived that context sensitive scrutiny with regards to their excessive recordkeeping claim in part where plaintiffs asserted "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the [p]lans" and alleged that recordkeeping services are fungible, that the market for them is highly competitive, and "that $35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the [p]lans' features."  *Hughes*, 63 F.4th at 632.  Similarly, here as in *Hughes*, Plaintiffs allege that "the market for recordkeeping is highly competitive, with many vendors *equally* capable of providing a high-level service," there are two types of recordkeeping services provided by all national recordkeepers—including bundled "fungible" services and à la carte services—for large plans, and that the Committee failed to use its bargaining power to obtain

services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. (Compl. ¶¶ 75–78, 85 & 95 (emphasis added)).[6] Accordingly, Defendants' reliance on *Albert* is unavailing.

Finally, in *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022), the Eighth Circuit found that the plaintiffs failed to state a claim for excessive recordkeeping expenses where "[r]ather than point[ing] to the fees paid by other specific, comparably sized plans, the plaintiffs rel[ied] on industry-wide averages" that did not specify whether the recordkeeping expenses were too expensive in relation to the services rendered. *Matousek*, 51 F.4th at 279–80. In contrast, here, Plaintiffs have offered allegations regarding the fees paid by other specific comparably sized plans. (Compl. ¶ 93). When those comparisons are considered in conjunction with the other context-specific facts already discussed by the Court, Plaintiffs have done enough to state a plausible claim. (*Id.* ¶¶ 84–95).

Though the parties have made the Court aware of rulings from other Circuits coming to different conclusions on similar claims,[7] which the Court has considered, it does not appear that

---

[6]    Defendants point out that in contrast to the present case, the plaintiffs in *Hughes* also provided examples of several other university 403(b) plans that successfully reduced recordkeeping fees by soliciting competitive bids, consolidating service providers, and negotiating rebates and cited industry experts who recommended soliciting bids to reduce overall fees. (D.E. No. 43 at 4 (citing *Hughes*, 63 F.4th at 632–33)). Nevertheless, as already discussed, Plaintiffs here do provide additional context for their recordkeeping and administrative fees claim that is sufficient to withstand a motion to dismiss.

[7]    Since Defendants filed their motion to dismiss, the parties have submitted multiple supplemental notices of authority addressing similar allegations. (D.E. Nos. 23–25, 28–31, 33, 35–36, 38–40, 43–44, 46, 48 & 50–53). As these notices, and the other cases the parties cite, demonstrate, district courts around the country have addressed similar claims regarding excessive recordkeeping and administrative fees differently. *See, e.g., Krutchen v. Ricoh USA, Inc.*, No. 22-0678, 2023 WL 3026705, at *2 (E.D. Pa. Apr. 20, 2023) (dismissing nearly identical claim for excessive recordkeeping fees where plaintiffs alleged recordkeeping services were fungible); *Singh v. Deloitte LLP*, No. 21-8458, 2023 WL 4350650, at *4–5 (S.D.N.Y. July 5, 2023) (same); *Singh v. Deloitte LLP*, No. 21-8458, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (same); *Matney v. Barrick Gold of N. Am., Inc.*, No. 20-0275, 2022 WL 1186532, at * 11–13 (D. Utah Apr. 21, 2022) (dismissing excessive recordkeeping fees claim); *Jones v. Dish Network Corp.*, No. 22-0167, 2023 WL 2644081, at * 5 (D. Col. Mar. 27, 2023) (same); *Mator v. Wesco Distrib., Inc.*, No. 21-0403, 2022 WL 1046439, at *6–7 (W.D. Pa. Apr. 7, 2022) (same); *Nohara v. Prevea Clinic Inc.*, No. 20-1079, 2022 WL 16927810, at *3–4 (E.D. Wis. Oct. 27, 2022), *report and recommendation adopted*, No. 20-1079, 2022 WL 16924483 (E.D. Wis. Nov. 14, 2022) (same); *Cunningham v. USI Ins. Servs., LLC*, No. 21-1819, 2022 WL 889164, at *4 (S.D.N.Y. Mar. 25, 2022) (same), *Tobias v. NVIDIA Corp.*, No. 20-6081, 2021 WL 4148706, at *14–15 (N.D. Cal. Sept. 13, 2021) (same); *but see, e.g., McDonald behalf of Lab'y Corp. of Am. Holdings Employees' Ret. Plan v.*

the Third Circuit has foreclosed Plaintiffs' claim regarding excessive recordkeeping and administrative fees at this time.  As already stated, in *Sweda*, the Third Circuit held that the plaintiffs plausibly alleged a breach of the duty of prudence regarding excessive administrative and recordkeeping fees, where plaintiffs alleged that (i) the plan paid fees that were higher than those paid by similar plans for the same services; (ii) fees went up as assets grew despite there being no corresponding increase in services; (iii) the defendants failed to negotiate a cap on fees or solicit competitive bids for recordkeeping fees, despite the fact that similarly situated fiduciaries had taken such actions; and (iv) the defendants failed to review plan management and leverage the plan's size to obtain lower fees or rebates.  *Sweda*, 923 F.3d at 330–31.  Similarly, here Plaintiffs have alleged that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the Committee failed to use its bargaining power to obtain services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost, the Plan's recordkeeping and administrative costs increased from year to year despite the fact that the number of participants in the Plan remained relatively unchanged, there was a general trend towards lower recordkeeping expenses in the marketplace as

---

*Lab'y Corp. of Am. Holdings*, No. 22-0680, 2023 WL 4850693, at * 4–7 (M.D.N.C. July 28, 2023) (denying motion to dismiss for excessive recordkeeping fees claim); *Mazza v. Pactiv Evergreen Servs. Inc.*, No. 22-5052, 2023 WL 3558156, at *3–4 (N.D. Ill. May 18, 2023) (same); *Sutter Health*, 2023 WL 1868865, at *10 (same); *Hagins v. Knight-Swift Transportation Holdings Inc.*, No. 22-01835, 2023 WL 3627478, at *5 (D. Ariz. May 24, 2023) (same); *Rodriguez*, 2022 WL 16648825, at *9–12 (same); *Garcia v. Alticor, Inc.*, No. 20-1078, at 5–6 (W.D. Mich. Aug. 23, 2022) (same); *Coyer v. Univar Sols. USA Inc.*, No. 22-0362, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (same); *Garnick, et al. v. Wake Forest Univ. Baptist Med. Ctr.*, No. 21-0454, 2022 WL 4368188, at *7 (M.D.N.C. Sept. 21, 2022) (same); *Monteiro v. The Children's Hospital Corp.*, No: 22-10069 (D. Mass Mar. 15, 2023) (D.E. No. 56) (same); *Lucero v. Credit Union Ret. Plan Ass'n*, No. 22-0208, 2023 WL 2424787, at *3–5 (W.D. Wis. Mar. 9, 2023) (same); *Norton v. Mass General Brigham Inc.*, No. 22-10045 (D. Mass. Mar. 15, 2023) (D.E. No. 69) (same); *McLachlan v. Board of Trustees of The Elevator Constructors Annuity And 401(K) Retirement Plan*, No. 22-4115 (E.D.P.A. June 7, 2023) (D.E. No. 35).

Having considered these authorities and for the reasons already stated above, the Court finds persuasive the reasoning employed by other courts in this Circuit, including this Court, that have allowed similar claims for excessive recordkeeping and administrative expenses to proceed.  *Silva*, 2020 WL 12574912, at *8; *Johnson*, 2022 WL 973581, at *6; *Berkelhammer*, 2022 WL 3593975, at * 4–6.

a whole, and the Committee failed to conduct an RFP at reasonable intervals.  (Compl. ¶¶ 73–95).

Though Defendants argue that *Sweda* is highly distinguishable from the instant Complaint, the

Court finds that under Third Circuit precedent Plaintiffs have sufficiently pled that the Committee

breached its duty of prudence under 29 U.S.C. § 1104(a)(1)(B).[8]

    *Second*, Defendants argue that Plaintiffs have failed to allege that the recordkeeping and

administrative fees paid by the Plan were excessive because the Complaint's allegations are based

on demonstrably false facts.  (Mov. Br. at 27–29).  More specifically, Defendants contend that

while the Complaint's calculation of the Plan's recordkeeping and administrative fees, based on a

charge of 0.04% of total Plan assets, encompasses both recordkeeping and all administrative costs

of the Plan, the comparator figures alleged in the Complaint only encompass recordkeeping

expenses.  (*Id.* at 28).  In other words, Defendants argue that the Complaint "falsely compares

Nokia's total Plan administrative costs to comparator plans' recordkeeping fees."  (*Id.*).  Further,

Defendants assert that while the Complaint alleges that the Plan's recordkeeping and

administrative fees amounted to 0.04% of Plan assets from 2015–2020 (Compl. ¶ 87), in recent

years, the recordkeeping and administrative fees for the Plan were only 0.03% of Plan assets—

causing the Complaint to reflect artificially inflated figures for the Plan's recordkeeping and

administrative fees.  (Mov. Br. at 27–28).  Defendants contend that the disparity between the Plan's

recordkeeping fees and comparator fees would have been much lower if Plaintiffs had calculated

---

[8]      Defendants argue that the Third Circuit's decision in *Sweda* has been tempered by the Supreme Court's decision in *Hughes*, which stated that "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific" and "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."  (Mov. Br. at 11–13); *Hughes*, 142 S. Ct. at 742 (quoting *Dudenhoeffer*, 573 U.S. at 425).  Even if this were true, here, Plaintiffs have provided the necessary context for their excessive recordkeeping and administrative fees claim, as described above.

those fees correctly using Nokia's Plan IRS Form 5500s.[9]  (*Id.* at 28).  In opposition, Plaintiffs

contend that the Complaint plainly states that "the Plan stuck with a charge to participants based

on .04% of the Plan's assets up to 2018 and then moved to .03% of the Plan's assets from 2019

and forward."  (Opp. Br. at 22 (quoting Compl. ¶ 86)).  Plaintiffs further contend that "[t]he

Complaint compares all-in recordkeeping and administration fees for the Plan with all-in

recordkeeping and administration fees for the comparator plans."  (*Id.*).  Finally, Plaintiffs assert

that any miscalculation was based on the fact that they lacked access to accurate Plan data from

the Plan's publicly filed form 5500s at the time of filing their Complaint.  (*Id.* at 24 n.14).  For the

following reasons, the Court finds Defendants' argument unavailing.

To start, "[t]hese challenges attack the accuracy of the Plaintiffs' factual allegations" and

"are thus not cognizable at the motion to dismiss stage, where [the Court] must accept as true all

factual allegations in the [] Complaint."  *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 22-0111,

2023 WL 2301962, at *17 (D. Conn. Mar. 1, 2023).  In effect, Defendants are asking that the Court

accept an alternative set of facts than those alleged in the Complaint—Defendants' calculation of

the Plan's recordkeeping fees.[10]  However, any initial miscalculation by Plaintiffs based on lack

---

[9]     "The Form 5500 is the annual report that 401(k) plans are required to file with the [Department of Labor] and U.S. Department of Treasury pursuant to the reporting requirements of ERISA."  (Compl. ¶ 75 n.11).

[10]     Defendants argue that "in the event of a contradiction between a document directly or indirectly relied upon in a complaint and an allegation *in* the complaint, the document controls, not the allegation, and the allegation is not entitled to a presumption of truth."  (Mov. Br. at 3 n.1 (citing *St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. 04-4540, 2005 WL 1199045, at *3 (D.N.J. May 18, 2005)).  Here, Defendants rely on Nokia's Plan IRS Form 5500s in calculating the Plan's recordkeeping fees.  (Mov. Br. at 28).  Though Plaintiffs' Complaint cites to some of the Plan's Form 5500s (*see* Compl. ¶¶ 1 n.2 & 26), Plaintiffs argue in Opposition that they did not have access to accurate Plan data from the Plan's publicly filed form 5500s at the time of filing their Complaint.  (Opp. Br. at 24 n.14).  Defendants assert that Nokia provided Plaintiffs with numerous documents pre-suit, including all fee and expense disclosures, plan documents, and fund sheets and state that Plaintiffs appear to have drafted the Complaint in reliance on those documents.  (Reply at 9–10; Compl. ¶ 25 ("Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) . . . until shortly before this suit was filed.")).  Nevertheless, while Plaintiffs bear the burden of pleading their claim, they do not bear the burden of rebutting Defendants' competing factual narrative at this time.  And regardless, as discussed below, Plaintiffs' claim regarding excessive recordkeeping and administrative fees does not warrant dismissal even under Defendants' narrative.

of information is not "enough to thwart Plaintiffs' claim at the pleading stage," where the Court draws all plausible inferences in Plaintiffs' favor, "particularly when considered alongside the Complaint's other allegations of imprudence" regarding the Plan's excessive recordkeeping and administrative fees.[11]  *Silva*, 2020 WL 12574912, at *8.

Further, Plaintiffs' claim regarding excessive recordkeeping and administrative fees does not warrant dismissal even if the Court were to accept what Defendants assert are the figures for the Plan's recordkeeping costs from the years of 2015 to 2020.  (Mov. Br. at 28).  Under Defendants' calculations, the Plan's recordkeeping fees amounted to $37.22, $32.63, $62.71, $38.44, $33.54, and $50.03 from 2015 to 2020, in contrast to the fees the Complaint alleges, which range from $76.59 to $116.26 for those years.  (Mov. Br. at 28; Compl. ¶ 87).  The Third Circuit has emphasized that the "reasonableness of compensation for services" is an "inherently factual question."  *Sweda*, 923 F.3d at 329 (internal quotations omitted).  Thus, to the extent Defendants can "conclusively demonstrate that such fees were prudent in light of prevailing market conditions" or otherwise show that they engaged in a prudent process in setting those fees, they may do so on a motion for summary judgment.  *Silva*, 2020 WL 12574912, at *8.

---

Defendants also direct the Court to cases that have taken judicial notice of Form 5500s and "discredit[ed] allegations of excessive fees that are contradicted by the Form 5500s."  (D.E. No. 39 at 3).  However, any initial miscalculation by Plaintiffs based on lack of information is not "enough to thwart Plaintiffs' claim at the pleading stage," where the Court draws all plausible inferences in Plaintiffs' favor, "particularly when considered alongside the Complaint's other allegations of imprudence" by Defendants regarding the Plan's excessive recordkeeping and administrative fees.  *Silva*, 2020 WL 12574912, at *8.

[11]   While not fatal to Plaintiffs' claim, the Court agrees with Defendants that the apparent inflation of data in the Complaint is troubling.  First, while the Complaint does plainly state that the Plan stuck with a charge for recordkeeping fees to participants "based on 0.04% of the Plan's assets up to 2018 and then moved to 0.03% of the Plan's assets from 2019 and forward" (Compl. ¶ 86), the figures it provides appear to be based on a 0.04% charge in all years.  (*Id.* ¶ 87).  Second, while Plaintiffs contend that "[t]he Complaint compares all-in recordkeeping and administration fees for the Plan with all-in recordkeeping and administration fees for the comparator plans" (Opp. Br. at 22), the Complaint alleges that the fees charged to comparator plans "signif[y] recordkeeping fees."  (Compl. ¶ 93 n.14).  Nevertheless, the merits of these competing factual narratives cannot be decided on this procedural posture.  And as described below, Plaintiffs' claim regarding excessive recordkeeping and administrative fees does not warrant dismissal even under Defendants' narrative.

Defendants contend that they can already demonstrate that the Plan's recordkeeping fees under their calculations were reasonable in light of allegations in Plaintiffs' Complaint. (Mov. Br. at 28–29).   For example, Defendants point out that based on their calculations, the Plan's recordkeeping fees in 2019 of $33.54 per participant were on par with the recordkeeping fees charged by two of Plaintiffs' comparators in 2019—the Kaiser Permanente Plan ($33.00) and the Danaher Corporation Plan ($34.00).   (*Id.* at 29).   Further, Defendants assert that in four of the six years during the Class Period, the Plan generally paid recordkeeping fees of around $35.00 per participant, which is reasonable under the Complaint's allegations.[12]   (Reply at 10 (citing Compl. ¶ 94 ("Some authorities cited in case law dating as far back as six years ago recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day. Thus, even the $35 mark is a conservative figure.")).   Plaintiffs argue that the Plan paid excessive recordkeeping fees even according to Defendants' own calculations.   (Opp. Br. at 23).   The Court finds Defendants' arguments unavailing at this stage.   To start, the Complaint alleges that "the Plan, with over 29,000 participants and over $8 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present."   (Compl. ¶ 93).   Under Defendants' calculations, the Plan's fees, ranging from $32.63 to $62.71, exceeded that $20 range during all years of the Class Period. (Mov. Br. at 28).   Further, though the Plan's recordkeeping fees in 2019 of $33.54 under Defendants' calculations may have been close to the fees charged by two of Plaintiffs' comparators in 2019, it exceeded the fees charged by five others—the Publicis Benefits Connection 401k Plan ($21.00), Deseret 401k Plan ($22.00), The Dow Chemical Company Employees' Savings Plan

---

[12]      Defendants explain that there were only two years when the Plan's recordkeeping costs, under their own calculations, exceeded the average of around $35 per participant.   (Reply at 10).   However, while Defendants attempt to explain why their recordkeeping fees were higher in those two years (Mov. Br. at 28 nn.10–11), the merits of this competing factual narrative cannot be decided on this procedural posture.

($25.00), The Savings and Investment Plan ($27.00), and The Rite Aid 401k Plan ($30.00).  (*See id.*; Compl. ¶ 93).  Additionally, while the Complaint does state that "reasonable rates for jumbo plans typically average around $35 per participant" it also states that such costs "are coming down every day" making "the $35 mark [for recordkeeping fees] a conservative figure."  (Compl. ¶ 94).  And the Plan's fees under Defendants' calculations exceeded that "$35 mark" in 2015 ($37.22), 2017 ($62.71), 2018 ($38.44), and 2020 ($50.03).  (Mov. Br. at 28).  Though the differences between the Plan's recordkeeping fees and both the comparators and the "$35 mark" might be smaller under Defendants' calculations than under the calculations alleged in the Complaint, they are not sufficient at this stage to warrant a dismissal of Plaintiffs' claim, particularly since the "reasonableness of compensation for services" is an "inherently factual question," *Sweda*, 923 F.3d at 329 (internal quotations omitted), and "even relatively minor cost savings can add up over the length of an investment."  *Silva*, 2020 WL 12574912, at *6; *Sweda*, 923 F.3d at 328 ("Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." (internal quotations and citation omitted)).  And as already stated, to the extent Defendants can "conclusively demonstrate that such fees were prudent in light of prevailing market conditions" or show that they engaged in a prudent process in setting those fees, they may do so on a motion for summary judgment.  *Id.* at *8.

*Third*, Defendants argue that Plaintiffs have improperly cherry-picked only seven plans with lower recordkeeping fees out of hundreds of thousands to create an inference that the Plan's fees were excessive.  (Mov. Br. at 29).  While Defendants may ultimately show that the seven comparator plans Plaintiffs have included in their Complaint have been cherry-picked and "are not

representative of recordkeeping costs across the industry," this argument is not sufficient to dismiss Plaintiffs' claim at the pleading stage, where inferences are to be drawn in Plaintiff's favor. *Rodriguez*, 2022 WL 16648825, at *10.  This is particularly true when considered alongside the Complaint's other allegations of imprudence by Defendants regarding the Plan's excessive recordkeeping and administrative fees.[13]

*Fourth*, Defendants argue that though the Complaint alleges imprudence based on the Committee's failure to conduct an RFP, competitive bidding is not required under ERISA.  (Mov. Br. at 26 n.9 (citing *White v. Chevron Corp.*, No. 16-0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016))).  However, while competitive bidding might not be required under ERISA, courts have found that a defendant's "fail[ure] to conduct a competitive bidding process" is a relevant factor to determining whether the defendant acted imprudently.  *Nicolas v. Trs. of Princeton Univ.*, No. 17-3695, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017); *see also Sweda*, 923 F.3d at 330.  Accordingly, Defendants' argument is unavailing.  As such, Defendants' motion to dismiss Plaintiffs' excessive recordkeeping and administrative fee claim is **DENIED**.

### B.   Failure to Monitor

Defendants also argue that Plaintiffs' failure to monitor claim in Count II should be dismissed because it is "derivative" of Count I, which fails to state a claim.  (Mov. Br. at 29–30).  Plaintiffs contend that they have sufficiently stated a claim in Count II because they have

---

[13]      Defendants also argue that the data presented in paragraph 93 of Plaintiffs' Complaint undercuts Plaintiffs' theory that recordkeeping fees decrease as the number of plan participants and assets under management increase, since two of the comparator plans with higher numbers of participants and assets under management also had higher recordkeeping expenses.  (Mov. Br. at 25–26).  Plaintiffs allege that "[b]ecause recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis" such that "[p]lans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee."  (Compl. ¶ 79).  And in fact, the Publicis Benefits Connection 401k Plan, which had the highest number of participants from all of the comparator plans in paragraph 93 of Plaintiffs' Complaint, had the lowest recordkeeping fee.  (*Id.* ¶ 93).  Accordingly, the data presented in paragraph 93 of Plaintiffs' Complaint does not categorically undercut Plaintiffs' theory.

adequately pleaded the underlying fiduciary breach necessary to support their failure to monitor claim.  (Opp. Br. at 27).  In Count II, Plaintiffs allege that because Nokia and the Board "had the authority to appoint and remove members of the Committee" they had a duty to monitor the Committee and ensure that the Committee was "adequately performing their fiduciary obligations."  (Compl. ¶¶ 105–06).

"Persons with authority to appoint and remove plan fiduciaries have an ERISA-imposed duty to monitor those fiduciaries."  *Silva*, 2020 WL 12574912, at *9.  "At minimum, an appointing authority must 'at reasonable intervals' review the performance of its appointees 'in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards.'"  *Id.* (quoting *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 466 (D.N.J. 2008)).  Without an underlying breach of an ERISA-imposed duty, a failure to monitor claim cannot proceed.  *In Re Allergan Erisa Litig.*, 975 F.3d 348, 354 n.11 (3d Cir. 2020).  Conversely, "[c]ourts have been willing to find a failure to monitor claim [when] the plaintiff has adequately alleged a breach of fiduciary duty claim."  *McGowan v. Barnabas Health, Inc.*, No. 20-13119, 2021 WL 1399870, at *8 (D.N.J. Apr. 13, 2021).

As discussed, Plaintiffs have adequately alleged a breach of fiduciary duty under Count I with regards to the Plan's excessive recordkeeping and administrative fees.  Accordingly, Count II may proceed as it relates to those fees.  *Garthwait v. Eversource Energy Co.*, No. 20-0902, 2021 WL 4441939, at *10–11 (D. Conn. Sept. 28, 2021); *Ruilova*, 2023 WL 2301962, at *22–23. "However, the duty to monitor claim is only as broad as the surviving prudence claim[] and is otherwise dismissed" *without prejudice*.  *Cunningham v. Cornell Univ.*, No. 16-6525, 2017 WL 4358769, at *11 (S.D.N.Y. Sept. 29, 2017).

## IV.    CONCLUSION

Based on the foregoing, Defendants' motion (D.E. No. 20) is **GRANTED-in-part** and

**DENIED-in-part**.  An appropriate Order follows.

Dated: August 8, 2023                              *s/ Esther Salas*
                                                   **Esther Salas, U.S.D.J.**