## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL M. SEIBERT, THOMAS F. SOLURY, DANA MOLINEAUX, HENRY WORCESTER, STEPHANIE SCHNEPP, JOHN STRONG, JR. AND SCOTT C. ALLEN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NOKIA OF AMERICA CORPORATION, THE BOARD OF DIRECTORS OF NOKIA OF AMERICA CORPORATION, NOKIA 401(K) COMMITTEE and JOHN DOES 1-30. <br><br> Defendants. | CIVIL ACTION NO.: 2:21-cv-20478-ES-AME |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Paul M. Seibert, Thomas F. Solury, Dana Molineaux, Henry Worcester, Stephanie Schnepp, John Strong, Jr. and Scott C. Allen ("Plaintiffs"), by and through their attorneys, on behalf of the Nokia Savings/401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. Prior to 2016, the Plan was known as the Alcatel-Lucent/401(k) Plan but was changed to its current name after 2016 and as used herein, both names should be construed broadly to account for both possibilities during the Class Period which, as will be discussed in more detail below, is defined as December 13, 2015 through the date of judgment ("Class Period").

Plan's fiduciaries, which include Nokia of America Corporation[2] ("Nokia" or "Company") and the Board of Directors of Nokia of America Corporation and its members during the Class Period[3] ("Board") and the Nokia 401(k) Committee[4] and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look*

---

[2] Prior to 2017, Alcatel-Lucent USA Inc. was listed as the Plan Sponsor in the Plan's annual 5500 filing and subsequent to 2017 Nokia of America Corporation was listed as the Plan Sponsor. The term "Nokia" or "Company" should be construed broadly to include both possibilities during the appropriate time frames or frame.

[3] Prior to 2016 the Board may have been known as the Board of Directors of Alcatel-Lucent USA, Inc. and as used herein, both names should be construed broadly to account for both possibilities. As discussed above, the Class Period, is defined as December 13, 2015 through the date of judgment ("Class Period") and will be discussed in more detail below.

[4] The Nokia 401(k) Committee was formerly known as the Alcatel-Lucent 401(k) Committee. The name of the Alcatel-Lucent 401(k) Committee was changed to the Nokia 401(k) Committee effective on January 1, 2017. As used herein, both Committees should be construed broadly to account for both possibilities.

*at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015)
(*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration
to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and
implementing strategies for the investment and management of trust assets, trustees are obligated
to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to
prudence in the investment function,' and should be applied 'not only in making investments but
also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98
(9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[5]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's
investment results over time because "[b]eneficiaries subject to higher fees … lose not only money
spent on higher fees, but also lost investment opportunity; that is, the money that the portion of
their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at
1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the
beneficiary's investment shrinks.").

7.       Most participants in defined contribution plans like 401(k) plans expect that their
accounts will be their principal source of income after retirement.  Although at all times plan
accounts are fully funded, that does not prevent plan participants from losing money on poor

---

[5] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-
center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be
aware that your employer also has a specific obligation to consider the fees and expenses paid by
your plan.").

investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8. Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9. At all times during the Class Period, the Plan had at least $6.3 billion dollars in assets under management. At the end of 2020 and 2019, the Plan had over $8.5 billion dollars and $7.9 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Nokia Savings/401(k) Plan ("2020 Auditor Report") at 25.

10. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11. Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) failing to control the Plan's recordkeeping costs.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

### Plaintiffs

17.     Plaintiff, Paul M. Seibert ("Seibert"), resides in Henrico, Virginia. During his employment, Plaintiff Seibert participated in the Plan investing in the options offered by the Plan and was subject to the excessive administration and recordkeeping costs alleged below.

18.     Plaintiff, Thomas F. Solury ("Solury"), resides in Yucaipa, California. During his employment, Plaintiff Solury participated in the Plan investing in the options offered by the Plan and was subject to the excessive administration and recordkeeping costs alleged below.

19.     Plaintiff, Dana Molineaux ("Molineaux"), resides in Chandler, Arizona. During her employment, Plaintiff Molineaux participated in the Plan investing in the options offered by the Plan and was subject to the excessive administration and recordkeeping costs alleged below.

20.     Plaintiff, Henry Worcester ("Worcester"), resides in Pataskala, Ohio. During his employment, Plaintiff Worcester participated in the Plan investing in the options offered by the Plan and was subject to the excessive administration and recordkeeping costs alleged below.

21.     Plaintiff, Stephanie Schnepp ("Schnepp"), resides in Raleigh, North Carolina. During her employment, Plaintiff Schnepp participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit, including the Retirement Date 2040 Fund and was subject to the excessive administration and recordkeeping costs alleged below.

22.     Plaintiff, John H. Strong, Jr. ("Strong"), resides in Downers Grove, Illinois. During his employment, Plaintiff Strong participated in the Plan investing in the options offered by the Plan and was subject to the excessive administration and recordkeeping costs alleged below.

23.     Plaintiff, Scott H. Allen ("Allen"), resides in Pataskala, Ohio. During his employment, Plaintiff Allen participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit, including the Retirement Date 2040 Fund and was subject to the excessive administration and recordkeeping costs alleged below.

24.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts

currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

25.     Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

### Company Defendant

26.     Nokia is the Plan sponsor and a named fiduciary with a principal place of business being 600 Mountain Avenue, Room 6D-401A, Murray Hill, New Jersey.  The December 31, 2020 Form 5500 of the Nokia Savings/401(k) Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Nokia is a leading network solution provider for communications across mobile, fixed and cloud networks.[6] Nokia currently has over 10,000 employees, 26 office locations, 2 data centers and 3 innovation centers in North America. *Id.*

27.     Nokia appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Alcatel-Lucent Savings/401(k) Plan as Amended and Restated, Effective January 1, 2015 ("Plan Doc.") at 76. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[6] https://www.nokia.com/about-us/company/worldwide-presence/north-america/ last accessed on December 5, 2021.

28.     Accordingly, Nokia during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

29.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

30.      Nokia, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. *Id*. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

32.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

33.     As discussed above, Nokia and the Board appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. *Id*.

34.     The Plan Document provides some detail about the responsibilities of the Committee. Pursuant to the Plan Doc., "[t]he Committee shall have full discretionary authority to determine the number and type of investment options … ." *Id*. As will be discussed in detail below, the Committee fell well short of these fiduciary goals.

35.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

37.     To the extent that there are additional officers, employees and/or contractors of Nokia who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Nokia officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 13, 2015 through the date of judgment (the "Class Period").

39.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 29,277 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

40.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are/were fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duties of loyalty and
>
> prudence by engaging in the conduct described herein;

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C. Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

42. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43. This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   THE PLAN

45.     Nokia established the Plan "to allow each Participant to elect to set aside a portion of his or her salary on a pre-tax and after-tax basis, and to encourage Employees to save regularly and consistently on a long-term basis by matching a portion of such deferrals with Employer contributions to the extent set forth in the Plan." Plan Doc. at 2. As will be discussed below, the Plan has been hindered in fulfilling its purpose by the fiduciary breaches of the Defendants.

46.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 39.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

47.     In general, "[t]he Plan covers eligible employees of the Company and those of its affiliates that are identified in the Plan document as 'Participating Companies' with respect to the Plan." 2020 Auditor Report at 5.

### *Contributions*

48.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions

based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 6.

49.     With regard to employee contributions: "[p]articipant contributions of 1% to 50% of eligible compensation may be authorized." *Id*. With regard to matching contributions made by Nokia: Nokia "does not match contributions for management employees." *Id.* However, "[w]ith respect to represented/occupational employees, after completion of six months of service, the Company contributes an amount equal to 66-2/3% of the lesser of the amount actually contributed … ." *Id.*

50.     Like other companies that sponsor 401(k) plans for their employees, Nokia enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

51.     Nokia also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

52.     Given the size of the Plan, Nokia likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

53.     With regard to contributions made by participants to the Plan: "[a]ll participant contributions and earning thereon are immediately vested and are not subject to forfeiture." 2020

Auditor Report at 7. Matching contributions made by Nokia are subject to a 3 year vesting schedule based on years of continuous service. *Id.*

### The Plan's Investments

54.     In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. Plan Doc. at 76. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

55.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

56.     The Plan's assets under management for all funds as of December 31, 2020 was $8,510,023,000.  2020 Auditor Report at 3.

### Payment of Plan Expenses

57.     During the Class Period, administrative expenses were generally paid using Plan assets. 2020 Auditor Report at 21.

### VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

A. **The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

58.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

59.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

60.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

61.     In fact, in an attempt to discover the details of the Plans' mismanagement, on August 23, 2021, the Plaintiffs wrote to Nokia requesting, *inter alia*, meeting minutes from the Committee. By Letter dated October 22, 2021, Nokia denied Plaintiffs' request for these meeting minutes.

62.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

63.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

64.     For example, Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

**B.**     **The Plan's Target Date Suite of Funds were Imprudent Due to Their Excessive Fees and Significant Underperformance Compared to Its Peers**

65.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

66.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…."  DOL 408(b)(2) Regulation Fact Sheet.

67.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

68.     Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

69.     In some cases, expense ratios for the Plan's funds were ***six basis points*** above the ICI Median (in the case of Retirement Date 2040 Fund) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median[9]** |
| Retirement Date 2025 Fund | 0.42% | Target Date | 0.40% |
| Retirement Date 2030 Fund | 0.45% | Target Date | 0.40% |
| Retirement Date 2035 Fund | 0.46% | Target Date | 0.40% |
| Retirement Date 2040 Fund | 0.45% | Target Date | 0.40% |
| Retirement Date 2045 Fund | 0.45% | Target Date | 0.40% |
| Retirement Date 2050 Fund | 0.45% | Target Date | 0.40% |
| Retirement Date 2055 Fund | 0.45% | Target Date | 0.40% |

70.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.
[9] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2018* at 55 (July 2021) (hereafter, "ICI Study") Medians at 66 and Averages at 54 available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Average** |
| Retirement Date 2025 Fund | 0.42% | Target Date | 0.37% |
| Retirement Date 2030 Fund | 0.45% | Target Date | 0.37% |
| Retirement Date 2035 Fund | 0.46% | Target Date | 0.37% |
| Retirement Date 2040 Fund | 0.45% | Target Date | 0.37% |
| Retirement Date 2045 Fund | 0.45% | Target Date | 0.37% |
| Retirement Date 2050 Fund | 0.45% | Target Date | 0.37% |
| Retirement Date 2055 Fund | 0.45% | Target Date | 0.37% |

71.     The funds listed above are known as pooled separate accounts. They are similar to mutual funds because they have general investment categories such as target date or domestic equity, for example. They are generally aimed at institutional investors, and, in theory, should be less expensive than their mutual fund counterparts.[10] However, here, the expense ratios for these pooled separate accounts are exorbitant as compared to their mutual fund counterparts. Clearly, this excess expense is being used, in part, to pay for the already excessive administration and recordkeeping expense, discussed below.

72.      The high fees of the target date fund suite were also not justified by their investment returns as they failed to perform well compared to their peers thereby causing significant losses to the Plan and its participants.

73.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

---

[10] *See,* Pooled Separate Accounts – 401(k) Plan Investments available at https://www.summitcpa.net/401k-audit-blog/pooled-separate-accounts last accessed on December 6, 2021.

74.     The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

75.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

76.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

77.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

78.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

79.     The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

80.     Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In

contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

81.     The proprietary target date series in this Plan are "Through" funds.

82.     Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are important components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals.

83.     Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[11]

84.     For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan.

---

[11] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

85.     It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

86.     A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

87.     A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

88.     With respect to investment returns, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

89.     The measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

90.     Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent options after their initial selection and insertion into the plan's suite of choices.

91.     During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses. Causes or contributing factors are identified and analyzed.

92.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

93.     Established target date fund investment managers include, but are not limited to, American Funds and T.Rowe Price. American Funds and T.Rowe have each offered target date funds for nearly 20 years and those target date funds have provided stable investment returns to 401(k) plan participants.

**(1)     The Proprietary Series of Target Date Funds in the Plan Chronically and Materially Underperformed its Peers and Benchmarks**

94.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's target date fund investment options.

95.     At all relevant times during the Class Period, the Plan maintained a proprietary Target Date Series. This target date series does not have any ticker symbol or a brand name associated with it strongly suggesting that these funds were created by the Plan or were unique to the Plan, its Recordkeeper and/or the Plan's advisor.

96.     In 2020, the Plan had more than $8 billion dollars in assets under management. 2020 Auditor Report at 3. With such a large amount invested, the Plan would have been able to

choose virtually any available target date series for the Plan. In the Plan's published documents, the funds are only identified as being a "Retirement Date Fund" with each corresponding target date year included in the title ("Proprietary Target Date Series"). For example, the 2040 target date fund in the Plan is referred to as the Retirement Date 2040 Fund. *See,* Nokia Savings/401(k) Plan, Annual Fee and Expense Disclosure effective April 1, 2021 ("21 Fee Disclosure") at 11.

97.     The Proprietary Target Date Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the Proprietary Target Date Series.

98.     Defendants were under an obligation under ERISA to carefully vet the Proprietary Target Date Series before selecting them for inclusion in the Plan. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of Proprietary Target Date Series on an ongoing basis thereafter and replace them when they underperformed. The Plan's fiduciaries failed to do this as explained in more detail below.

**(a)     The Proprietary Target Date Series in the Plan Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

99.     The Proprietary Target Date Series consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals.

100.     The Proprietary Target Date Series can be compared to various similar target date funds ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable Comparator funds include the T.Rowe Price Retirement target date suite and the American Funds target date suite. These two target date suites are suitable Comparator Funds to the Proprietary Target Date Series because Morningstar, the most well respected and accepted financial industry database places the Comparator funds in the Morningstar Lifetime Moderate Index category along with more than approximately 200 other commercially available target date

funds. Since the Proprietary Target Date Series are not publicly available, they're not categorized by Morningstar as performance information is not made available to the public. However, the Morningstar Lifetime Moderate Index is the index used by virtually all target date series for large retirement plans such as the Plan and would be applicable to the Proprietary Target Date Series. In addition, the Lifetime Moderate Index is accepted by financial industry professionals as the appropriate target date benchmark for large plans such as the Plan.

101.    A Morningstar Category is assigned by placing funds [*e.g.*, T.Rowe Price Retirement target date suite and the American Funds target date suite etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . .  Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

102.    Further, Morningstar itself states that it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[12] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be

_____

[12] Available at the following web address:
https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.

seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

103.    A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the Proprietary Target Date Series as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

104.    The performance of the Proprietary Target Date Series lagged behind the performance of the applicable Comparator Funds and Index for many years clearly showing that it was an imprudent choice for the Plan.

105.    The three year average performance, net of fees, as early as 2018, which analyzes data prior to the class period in order to provide a three year average, shows that the Proprietary Target Date Series has been historically an imprudent selection. Using target date 2040 as a sample target date year[13], it's clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the Proprietary Target Date Series was mediocre, at best. Here, two target date series from this Morningstar peer group will be analyzed, namely T.Rowe Price Retirement 2040 (TRRDX) and the American Funds 2040 Target Retirement R6 (RFGTX) ("collectively the "Two Comparator Funds") as against the published three year average for the 2040 version of the Proprietary Target Date Series, namely the Retirement Date 2040 Fund.

106.    As can be seen from the graph below, comparing the performance of the Two Comparator Funds and their performance to the appropriate Morningstar Index, Morningstar Lifetime Moderate Index, MSAAM40M, ("Morningstar Index"), it's clear the Proprietary Target Date Series performed poorly as compared to its peers and generally below its Morningstar Index

---

[13] A complete analysis for each target date year beginning in 2025 to 2060 is attached hereto as Appendix "A."

on a 3 year rolling average while the comparator funds performed well above, as demonstrated in the graph below:



107.     As can be seen in the chart above, the 2040 fund of the Proprietary Target Date Series failed to perform better than half of the commercially available target date funds. This evidences a clear lack of a prudent process in selecting and managing the funds in the Plan. Had the Plan fiduciaries utilized a process, in the best interest of plan participants, as required by ERISA, they would have realized the Proprietary Target Date Series should not have been selected for the Plan or at the very least removed very early in the Class Period. Similar results are seen for the remaining target date years in the Plan as demonstrated in Appendix "A."

108.    Using historical information that would or should have been available to the Plan fiduciaries as early as three years prior to the inception of the Class Period, it's clear, that the three year average return of the 2040 fund of the  Proprietary Target Date Series failed to perform better than half of the more than 200[14] funds available for selection in the Plan. T.Rowe Price Retirement 2040 (TRRDX) and the American Funds 2040 Target Retirement R6 (RFGTX) are but two examples of more than 100 funds that could have been selected for the Plan that would have been better choices. The appropriate benchmark for target date series such as T.Rowe and American Funds is clearly the Morningstar Lifetime Moderate Index, as discussed above. The Plan fiduciaries improperly identify the appropriate index for target date funds of this type but even using the wrong index as the Plan fiduciaries do, the funds still performed poorly and should have been replaced.

109.    Since the Proprietary Target Date Series was created by the Plan fiduciaries there is little publicly available historical performance information. What little was found was contained in the fee disclosures provided to the Plan participants. *See,* 21 Fee Disclosure at 11, for example. The three year historical performance at the end of 2018 for the 2040 fund of the Proprietary Target Date Series was abysmal as compared to its peers and appropriate benchmarks. The median out of 219 funds is represented by the red line in the chart at paragraph 130 which represent the median return average of all funds in the Morningstar Lifetime Moderate Category. In 2018, the median

---

[14] The number of funds categorized as being in the Morningstar Lifetime Moderate category varies by year as new funds become available and older funds or share classes are removed. In 2017, there were 234 funds, in 2018 there were 239, in 2019 there were 241, in 2020 there were 218, in 2021 there were 215. *See*, Total Return % chart at https://www.morningstar.com/funds/xnas/trrdx/quote last accessed on September 27, 2023. The funds in this Morningstar category do include the various share classes of each target date series available and the total return methodology used in the Chart of paragraph 130 backs out expense as far as is practical.

3-year return for this index was slightly over 7% as can be seen in the graph while the 2040 fund of the Proprietary Target Date Series was only 5.95% meaning that nearly 100 funds performed better and would have been better choices for the Plan.

110.     The fact that the 2040 fund of the Proprietary Target Date Series had such a low 3-year return, especially at the end of 2018, when compared to the nearly 200 funds in this Morningstar category suggests that the 2040 fund was well below its benchmarks for years prior and should not have been selected for inclusion in the Plan or at the very least should have been removed prior to the start of the Class Period.

111.     The difficulty in maintaining a properly functioning target date series is one reason the Plan should have prudently chosen an established and commercially available target date series. Instead of relying on a professionally and commercially available target date series, the Plan attempts to mimic the effects of such a product by mixing and changing various funds to mirror the performance of an appropriate commercially available product. *See,* 21 Fee Disclosure at 13 and 14, Section titled Retirement Date Funds. The 21 Fee Disclosure suggests that custom benchmarks must be constructed for the Proprietary Target Date Series because the mix of underlying investments is changed to resemble appropriate commercially available target date series. This has resulted in disastrous consequences for Plan participants as is seen in the chart at Paragraph 130, above.

112.     For all the reasons stated above,  the Proprietary Target Date Series in the Plan was clearly an imprudent choice given its high fees and severe underperformance compared to peers and should have never been selected for the Plan or at the very least should have been replaced as soon as the beginning of the Class Period.  Failure to do so cost the Plan and its participants millions of dollars.

**B.      The Plan's Recordkeeping and Administrative Costs Were Excessive During The Class Period**

113.      A clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

114.      The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."   Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

115.      There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).   First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.   Recordkeeping;

B.   Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.   Administrative services related to converting a plan from one recordkeeper to another;

D.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.   Maintenance of an employer stock fund (if needed);

F.  Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.  Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H.  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[15] (excluding the separate fee charged by an independent third-party auditor);

I.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

116.    This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

117.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant

---

[15]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

     A.  Loan processing;

     B.  Brokerage services/account maintenance (if offered by the plan);

     C.  Distribution services; and

     D.  Processing of qualified domestic relations orders.

118.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

119.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

120.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

121.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a

way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

122.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

123.    In this matter, using a combination of an asset based fee with revenue sharing used to cover that fee resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

124.    Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar

plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

125.    Because the Plan paid yearly amounts in recordkeeping fees that *increased* each year over the Class Period, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

126.    Instead, the Plan stuck with a charge to participants based on .04% of the Plan's assets up to 2018 and then moved to .03% of the Plan's assets from 2019 and forward. Given the size of the Plan, an asset-based charge made little sense. For example, in 2020, using .04% of the Plan's assets of $8,509,660,000 resulted in total administration and recordkeeping cost of $3,403,864. In 2020, this left the Plan with an unreasonably high per participant cost of $116. As will be discussed, below, this cost is outrageous when compared to other plans of this size.  Simply put, an asset-based approach with a multi-billion dollar plan such as the Plan makes little sense. This is the case because as plan size increases so does the per participant cost. In this case the costs appear to have been unchecked and had devastating effects on the participants.

127.    Looking at all the years during the Class Period, it's clear these unreasonably high recordkeeping costs continued throughout the Class Period. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

| | **2020** | **2019** | **2018** | **2017** | **2016** | **2015** |
|---|---|---|---|---|---|---|
| **Assets in Billions** | $8.509 | $7.902 | $6.942 | $7.837 | $7.144 | $6.380 |
| **Asset Charge** | **0.04%** | **0.04%** | **0.04%** | **0.04%** | **0.04%** | **0.04%** |
| **Charge** | $3,403,864 | $3,160,815 | $2,777,034 | $3,135,191 | $2,857,829 | $2,552,275 |
| **#PP** | 29277 | 30221 | 31991 | 33613 | 35039 | 33325 |
| **$PP** | $116.26 | $104.59 | $86.81 | $93.27 | $81.56 | $76.59 |

128.     The devastating effect of an asset-based charge is seen clearly here. While the number of participants remained relatively unchanged from 2015 to 2020, the per participant charge ***increased*** each year as the assets of the Plan increased. As detailed above, the per participant charge steadily increased from a low of $76 per participant in 2015 to a high of $116 per participant in 2020. A prudent fiduciary would have realized this and taken corrective action by seeking lower cost administrative and recordkeeping alternatives.

129.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs. At all times during the Class Period, the Plan had over 29,000 participants making it eligible for some of the lowest fees on the market. Further, NEPC, a consulting group, recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[16] The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  *See* Report at 1.

---

[16] Available at https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

130.    NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly under $40 per participant recordkeeping, trust and custody fees.  Report at 10.

131.    Looking at recordkeeping costs for plans of a similar size in 2019 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few well managed plans having more than 30,000 participants and approximately $3 billion dollars in assets under management:

| Comparable Plans' R&A Fees Paid in 2019[17] | | | | | |
|---|---|---|---|---|---|
| **Plan Name** | **Number of Participants** | **Assets Under Management** | **Total R&A Costs[18]** | **R&A Costs on Per-Participant Basis** | **Record-keeper** |
| Publicis Benefits Connection 401K Plan | 48,353 | $3,167,524,236 | $995,358 | **$21** | Fidelity |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $773,763 | **$22** | Great-West |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | **$25** | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | **$27** | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,834,091 | $1,526,401 | **$33** | Vanguard |

[17] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[18] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

| Comparable Plans' R&A Fees Paid in 2019[17] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs[18] | R&A Costs on Per-Participant Basis | Record-keeper |
| Danaher Corporation & Subsidiaries Savings Plan | 33,116 | $5,228,805,794 | $1,124,994 | **$34** | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | **$30** | Alight Financial |

Thus, the Plan, with over 29,000 participants and over $8 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present.

132.    Further, another source confirms the unreasonableness of the Plan's total recordkeeping costs.    Some authorities cited in case law dating as far back as six years ago recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day[19].   Thus, even the $35 mark is a conservative figure.

133.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

---

[19] Case law is in accord that large plans can bargain for low recordkeeping fees. *See, e.g., Spano v. Boeing,* Case 06-743, Doc. 446, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37-$42, supported by defendants' consultant's stated market rate of $30.42-$45.42 and defendant obtaining fees of $32 after the class period); *Spano,* Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20-$27 and plan paid recork-keeper $43-$65); *Gordon v. Mass Mutual*, Case 13-30184; Doc. 107-2 at 10.4 (D.Mass. June 15, 2016). (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Prudence
### (Asserted against the Committee)

134.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

135.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

136.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

137.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds and severe underperformance in relation to other comparable investments.

138.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan recordkeeping and administration costs.

139.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and poor investment fund performance.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

140.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

141.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
#### (Asserted against Nokia and the Board Defendants)

142.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

143.    Nokia and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

144.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

145.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

146.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's recordkeeping and administration, all to the detriment of the Plan and Plan participants' retirement savings.

147.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

148.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of

the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: September 28, 2023              **CAPOZZI ADLER, P.C.**

                                       /s/ Mark K. Gyandoh            .
                                       Mark K. Gyandoh, Esquire

N.J. Bar ID: 025622001
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Phone: (610) 890-0200
Fax: (717) 233-4103

/s/ Donald R. Reavey          .
**CAPOZZI ADLER, P.C.**
Donald R. Reavey, Esquire
(*Admitted Pro Hac Vice*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
Phone: (717) 233-4101
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2023, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  *<u>/s/ Mark K. Gyandoh</u>*
      Mark K. Gyandoh, Esq.