# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PAUL M. SEIBERT, THOMAS F. SOLURY, DANA MOLINEAUX, HENRY WORCESTER, STEPHANIE SCHNEPP, JOHN STRONG, JR. and SCOTT C. ALLEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NOKIA OF AMERICA CORPORATION, THE BOARD OF DIRECTORS OF NOKIA OF AMERICA CORPORATION, NOKIA 401(K) COMMITTEE and JOHN DOES 1-30.<br>Defendants. | Civil Case No. 21-cv-20478- ES-AME<br><br>CLASS ACTION<br><br>**Oral Argument Requested Pursuant to L. Civ. R. 78.1(b)** |

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT IN PART

---

**JACKSON LEWIS P.C.**
Howard Shapiro, Esq. (admitted *pro hac vice*)
Michael E. Holzapfel, Esq. (031022002)
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 08922
Telephone: (908) 795-5200
Email:      howard.shapiro@jacksonlewis.com
             michael.holzapfel@jacksonlewis.com

Attorneys for Defendants

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ..................................................................... iii

I.  INTRODUCTION. ...........................................................................1

II.  SUMMARY OF FACTS AND ALLEGATIONS. ..........................4

III.  STANDARD OF REVIEW. .............................................................7

IV.  LEGAL ARGUMENT ......................................................................9

     A.  Plaintiffs Again Fail to Plead Meaningful Benchmarks. ...........................................................10

     B.  Allegations of Isolated Periods of Underperformance are Insufficient to Demonstrate Imprudence. ....................................................18

     C.  The FAC's Allegations That the Nokia TDFs Should Have Been Replaced by or Supplemented With Commercial TDFs are Implausible. ...........................23

     D.  The FAC's Criticisms of the Nokia TDFs' Performance Are Hindsight-Based. .....................................26

     E.  The FAC Regurgitates the Same Allegations of Excessive Costs Which the Court Rejected in the Opinion. ....................................................27

     F.  The Court's Opinion Bars the Investment Claim as a Whole. ....................................................30

     G.  The FAC's Derivative Cause of Action for Breach of the Duty to Monitor Fails as to the Investment Claim Because Plaintiffs Fail to Plead Breach of the Duty of Prudence. ...............................31

|   | H. | The Court Should Dismiss the Investment Claim With Prejudice. | 32 |
| V. | | CONCLUSION | 32 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Allergan ERISA Litig.*,
    975 F.3d 348 (3d Cir. 2020) ...............................................................................31

*Anderson v. Intel Cop. Inv. Policy Comm.*,
    579 F. Supp. 3d 1133 (N.D. Cal. 2022)......................................................*passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................7

*Baumeister v. Exelon Corp.*,
    2023 U.S. Dist. LEXIS 175326 (N.D. Ill. Sep. 29, 2023) .....................21, 22, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................7

*Bowers v. NCAA*,
    563 F. Supp. 2d 508 (D.N.J. 2008) ....................................................................29

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ...............................................................................5

*Christianson v. Cold Indus. Operating Corp.*,
    486 U.S. 800 (1988)............................................................................................28

*Daramy v. AG of the United States*,
    365 F. App'x 351 (3d Cir. 2010) ........................................................................28

*In re Disney ERISA Litig.*,
    2017 U.S. Dist. LEXIS 61202 (C.D. Cal. Apr. 21, 2017) ...................................12

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
    2019 U.S. Dist. LEXIS 160112 (S.D.N.Y. Sep. 18, 2019) ................................14

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014)..............................................................................................8

*Hughes v. Northwestern Univ.*,
　142 S. Ct. 737 (2022) ........................................................................................8

*Kendall v. Pharm. Prod. Dev., LLC*,
　2021 U.S. Dist. LEXIS 61671 (E.D.N.C. Mar. 31, 2021)..................................28

*Kurtz v. Vail Corp.*,
　511 F. Supp. 3d 1185 (D. Colo. 2021)..................................................................9

*Lauderdale v. NFP Ret. Inc.*,
　2021 U.S. Dist. LEXIS 164437 (C.D. Cal. Aug. 18, 2021) ..............................26

*In re LinkedIn ERISA Litig.*,
　2021 U.S. Dist. LEXIS 221294 (N.D. Cal. Nov. 16, 2021) ...............................14

*Lum v. Bank of Am.*,
　362 F.3d 217 (3d Cir. 2004) ...............................................................................5

*Matney v. Barrick Gold of N. Am.*,
　80 F.4th 1136 (10th Cir. 2023) ..........................................................................29

*McCaffree Financial Corp. v. ADP, Inc.*,
　2023 U.S. Dist. LEXIS 56362 (D.N.J. Mar. 31, 2023) ......................................30

*Meiners v. Wells Fargo & Co.*,
　898 F.3d 820 (8th Cir. 2018) .....................................................................*passim*

*Nunez v. B. Braun Med., Inc.*,
　2023 U.S. Dist. LEXIS 145024 (E.D. Pa. Aug. 18, 2023) .................................11

*Patterson v. Morgan Stanley*,
　2019 U.S. Dist. LEXIS 174832 (S.D.N.Y. Oct. 7, 2019)...................................26

*Pinnell v. Teva Pharms. USA, Inc.*,
　2020 U.S. Dist. LEXIS 55617 (E.D. Pa. Mar. 31, 2020) .......................11, 27, 28

*Pizarro v. Home Depot, Inc.*,
　634 F. Supp. 3d 1260 (N.D. Ga. 2022)...............................................................25

*Rhett v. New Jersey State Superior Court*,
　260 F. App'x 513 (3d Cir. 2008) ........................................................................32

iv

*Sacerdote v. N.Y. Univ.*,
   328 F. Supp. 3d 273 (S.D.N.Y. 2018) ................................................................12

*Seibert v. Nokia of Am. Corp.*,
   2023 U.S. Dist. LEXIS 137621 (D.N.J. Aug. 8, 2023) .............................*passim*

*Silva v. Evonik Corp.*,
   2020 U.S. Dist. LEXIS 250206 (D.N.J. Dec. 30, 2020)......................................9

*Singh v. Deloitte LLP*,
   2023 U.S. Dist. LEXIS 6910 (S.D.N.Y. Jan. 12, 2023) ....................................28

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) ....................................................................19, 32

*Tobias v. Nvidia Corp.*,
   2021 U.S. Dist. LEXIS 173539 (N.D. Cal. Sep. 13, 2021) ...............................11

*Young Cho v. Prudential Ins. Co. of Am.*,
   2021 U.S. Dist. LEXIS 185397 (D.N.J. Sep. 27, 2021) ........................10, 12, 19

## Statutes and Regulations

29 C.F.R. § 2550.404a-5(d)(iii) .......................................................................25

29 U.S.C. § 1024(b)(4)....................................................................................23

Pub. L. 117-328, sec. 328 ..............................................................................25

Defendants Nokia of America Corporation ("Nokia"), the Board of Directors of Nokia of America Corporation ("Board"), and the Nokia 401(k) Committee ("Committee," and collectively with Nokia and the Board, "Defendants") respectfully submit this brief in support of their motion to dismiss, in part, Plaintiffs' First Amended Complaint ("FAC") [Dkt. No. 60].

## I.   <u>INTRODUCTION</u>.

Typically, when a District Court grants a motion to dismiss, but without prejudice and with leave to amend, its purpose in granting leave to amend is to give the plaintiff an opportunity to correct whatever deficiencies the Court found in the original pleading – to throw the plaintiff a lifeline, so to speak.   Defendants interpreted that to be the Court's intention when it released its opinion ("Opinion") [Dkt. No. 54] in August 2023 dismissing Plaintiffs' claim against the Committee for imprudent management of Nokia's 401(k) plan investments:

> Plaintiffs' claim for breach of the fiduciary duty of prudence regarding the Committee's failure to review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost is DISMISSED.  However, it is dismissed *without* prejudice. The Court cannot rule out the possibility that Plaintiffs might plausibly allege additional facts to show that the Committee breached its duty of prudence by failing to adequately review the Plan's investment portfolio with due care.

*Seibert v. Nokia of Am. Corp.*, 2023 U.S. Dist. LEXIS 137621, at *21 (D.N.J. Aug. 8, 2023) (Salas, J.) (emphasis in original).

1

It is also typical for a plaintiff who is thrown a such a lifeline to accept it, and remedy (or at least attempt to remedy) the prior pleading's deficiencies that caused the District Court to dismiss it in the first place.  Here, however, Plaintiffs have essentially refused the Court's lifeline.  The Opinion provided Plaintiffs with a roadmap to plead a plausible claim for investment imprudence.  The key to a viable claim, the Court held, is for Plaintiffs to identify comparable investments – "meaningful benchmarks" – to contrast with the challenged investments to create a plausible inference of imprudence.

Rather than follow the Court's guidance and plead meaningful benchmarks to show that the Nokia Savings/401(k) Plan's ("Plan") target date funds ("TDFs") were imprudent, Plaintiffs decided to double-down on the Original Complaint's generic allegation that the Nokia TDFs' expense ratios exceeded medians and averages published in a 2021 profile by the Investment Company Institute ("ICI Profile").  But this Court has already rejected the ICI Profile as a meaningful benchmark.  The FAC's *only* effort to augment the now discredited ICI Profile comparison is its cherry-picking of two commercial TDFs (offered by T. Rowe Price and American Funds) that allegedly outperformed the Nokia TDFs during an isolated segment of the Class Period.

As a factual matter, these performance-based allegations are new to the FAC, but as a legal matter, the Court has, effectively, already rejected them.  For the

reasons explained below, Plaintiffs' proffered comparator funds are no more suitable for assessing the Nokia TDFs' performance than the ICI Profile is suitable for assessing their costs.  And even if the comparators were meaningful benchmarks, a claim that a few other target date funds outperformed the challenged funds no more supports a plausible inference of deficient performance than a claim that "cheaper alternative investments existed in the marketplace" supports a plausible inference of excessive costs.  *See Opinion* at *16.

In the final analysis, the Original Complaint and the FAC are the same pleading with the same deficiencies.  Plaintiffs ignored the Court's guidance in the Opinion regarding the need for meaningful benchmarks, and in fact regurgitated, unchanged, the same allegations regarding excessive costs which the Court found insufficient to withstand a motion to dismiss.  As for the FAC's meager supplementation regarding fund performance – the pleading's only new element – the proffered T. Rowe Price and American Funds TDFs are not meaningful comparators, and ultimately Plaintiffs' allegations are based on pure hindsight.

The Court must therefore dismiss once again Plaintiffs' claim that the Committee imprudently selected and retained substandard investments, and that Nokia and the Board are derivatively liable for an alleged failure to monitor.  And

because Plaintiffs have already amended once and failed to cure the deficiencies in the Original Complaint, the Court should dismiss that claim *with* prejudice.[1]

## II.   SUMMARY OF FACTS AND ALLEGATIONS.

This putative class action arises under the Employee Retirement Income Security Act of 1974 ("ERISA").  The Original Complaint [Dkt. No. 1] alleged that the Committee breached its ERISA fiduciary duty of prudence in two ways: (1) by paying excessive fees to the Plan's recordkeeper (hereafter the "Recordkeeping Claim"); and (2) by retaining in the Plan's lineup seven of the thirteen available TDFs, along with other investment funds whose expense ratios were excessive compared to high-level data published in the ICI Profile (hereafter the "Investment Claim").  Plaintiffs also asserted a derivative claim that Nokia and the Board failed to adequately monitor the Committee in the exercise of its fiduciary functions.

The FAC's Investment Claim is narrower than the Original Complaint.  The Original Complaint challenged not only seven vintages of the Plan's TDFs, but also ten other Plan funds.  The FAC, however, challenges only the seven TDFs.  *Compare Original Complaint*, ¶ 69 (table) with *FAC*, ¶ 69 (table).

---

[1]     The FAC's Recordkeeping Claim remains unchanged from the Original Complaint.  *FAC*, ¶¶ 113-133.  Because the Court has already ruled that the Recordkeeping Claim is viable, Defendants confine the instant motion to the Investment Claim.

TDFs – referred to as "Retirement Date Funds" in the Plan's Annual Fee and Expense Disclosures ("AFED") – are multi-asset (e.g., stocks, bonds, real assets, and cash equivalents) investments geared to a specific year, known as the "target date" or "target year," in which the participant anticipates retiring. *FAC*, ¶¶ 73, 76; *see also Certification of Howard Shapiro* ("Shapiro Cert."), Exs. A-B (p. 18) (illustrating the TDFs' "investment mix over time").[2] Fiduciaries generally offer TDFs as a suite of investments in five-year or ten-year intervals, often referred to as "vintages." *FAC*, ¶ 69 (listing the 2025-2055 vintages of the Nokia TDFs). Over time, a TDF's asset allocation – or "glide path" – adjusts and rebalances to become more conservative as the participant nears and then passes the target date. *See id.*, ¶¶ 73-82. For example, a 28-year old employee may invest in a 2060 TDF weighted more heavily in equities (i.e., stocks) than a 2025 TDF selected by a 65 year-old employee contemplating imminent retirement.

---

[2]     In evaluating a motion to dismiss, a District Court is not limited to the four corners of the complaint, but may consider any documents explicitly relied upon in the complaint, documents that form the basis for the claim, and matters of public record. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Lum v. Bank of Am.*, 362 F.3d 217, 222 n.3 (3d Cir. 2004).

The AFEDs are among the FAC's source documents, upon which Plaintiffs base multiple allegations. *See FAC*, ¶¶ 25, 96, 109, 111. The AFEDs are also publicly available on the Plan's public website (www.benefitsanswersplus.com) at https://www.benefitanswersplus.com/retired_m/archives.html.   The Court may therefore consider the AFEDs on this motion.

A plan may select for its investment lineup commercially available TDFs from various fund managers, such as T. Rowe Price or American Funds. *Id.*, ¶¶ 100, 111. Alternatively, a plan may opt for proprietary (or "custom") TDFs designed specifically for the plan's population by its investment fiduciaries. *Id.*, ¶ 95. The Nokia TDFs are proprietary. *Id.* However, contrary to the FAC's characterization of proprietary funds as some type of hodge-podge investment assembled in-house (*see id.*), the designer and manager of Nokia's TDFs is AllianceBernstein L.P., one of the most respected investment management firms in the world. *See Shapiro Cert.*, Exs. A-B (p. 17) (AFED disclosure of AllianceBernstein L.P. as fund manager).

In the Original Complaint, Plaintiffs alleged that seven of the Plan's TDFs (the 2025 to 2055 vintages) were too costly compared to ICI Profile medians and averages. The FAC repeats this allegation. *Id.*, ¶¶ 69-70. In fact, when it comes to investment costs, the FAC is identical – almost verbatim – to the Original Complaint. *Compare Original Complaint*, ¶¶ 69-71 with *FAC*, ¶¶ 69-71.

The only substantive difference between the Original Complaint and the FAC is that, out of hundreds of commercial TDFs on the market, the FAC handpicks two offered by T. Rowe Price and American Funds, whose rolling three-year performance (i.e., returns on investment over the preceding three years) allegedly exceeded that of the Nokia TDFs of the same vintage from 2018 to 2020. *FAC*, ¶¶ 105-107, Appendix A. The FAC also alleges that the Nokia TDFs' performance

lagged behind the Morningstar Lifetime Moderate Index during this same period. *See id.*

Plaintiffs contend that these performance-based allegations, combined with their previously rejected allegations of excessive costs based on the ICI Profile, are sufficient to nudge the Investment Claim over the plausibility threshold. Plaintiffs are wrong.

## III.   <u>STANDARD OF REVIEW.</u>

Under the pleading standards articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a complaint must "state a claim to relief that is plausible on its face." *Twombly* 550 U.S. at 570. A "plausible" claim is one that is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To determine plausibility, the Court begins by stripping out of the pleading conclusory statements, which are not entitled to a presumption of truth, then evaluates whether the well-pled factual allegations that remain (if any) plausibly give rise to an entitlement to relief. *See id.* at 679. A plaintiff who establishes only "conceivable" or "possible" misconduct has not "nudged his claims…across the line" to plausibility." *Id.*

The *Twombly/Iqbal* pleading standard applies with equal force to 401(k) class actions of this sort, and the Court is required to apply that standard in the context of

7

the applicable substantive law, i.e., ERISA. *See Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022). ERISA imposes a "prudent person" standard by which to measure fiduciary decisions. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014). In assessing the duty of prudence, "a court must look at the process rather than the results. Hindsight is indeed 20/20, so the focus must be on the fiduciary's conduct in arriving at a decision." *Opinion* at *11 (citations omitted).

The Supreme Court instructs that a District Court's prudence analysis on a motion to dismiss must be "context-specific." *Hughes*, 142 S. Ct. at 742 (citing *Dudenhoeffer*, 573 U.S. at 425). In evaluating ERISA fiduciary claims, District Courts must recognize that "at times, circumstances facing an ERISA fiduciary will implicate difficult tradeoffs." *Id.* Thus, in evaluating a motion to dismiss, District Courts "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.*

The FAC, like the Original Complaint, exceeds 100 paragraphs. However, as with the Original Complaint, the majority of the FAC is non-specific, conclusory filler. With respect to the Investment Claim, most of the FAC's paragraphs consist of generalized statements regarding what TDFs are and what they are designed to do (*FAC*, ¶¶ 72-93); non-controversial and ultimately irrelevant statements that Nokia's TDFs are proprietary and serve as the Plan's qualified default investment alternative (*id.*, ¶¶ 94-98); and summaries of ERISA or other legal authorities (*id.*, ¶¶ 66-67).

8

For purposes of the *Twombly/Iqbal* standard, once the FAC is purged of its conclusory statements, it boils down (as did the Original Complaint) to fewer than ten relevant paragraphs. *See Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1197 (D. Colo. 2021) ("Much of plaintiff's complaint is taken up by statements explaining what ERISA requires, or providing generic background about performance of different types of investment funds. The deceptively long complaint can thus be boiled down to a few factual allegations."). Those paragraphs allege that seven of the Plan's thirteen TDFs were imprudent because of their high costs compared to the ICI Profile, and because of their alleged underperformance compared to two comparator funds and the Morningstar Lifetime Moderate Index. *See FAC*, ¶¶ 69, 70, 106-110. These allegations are insufficient to establish a plausible inference of fiduciary breach.

## IV.   <u>LEGAL ARGUMENT.</u>

In dismissing the Original Complaint's Investment Claim, the Court began with the well-established proposition that "Plaintiffs who rely on circumstantial evidence must provide a sound basis for comparison – a meaningful benchmark – to show a prudent fiduciary in like circumstances would have selected a different fund." *Opinion* at *13  (quoting *Silva v. Evonik Corp.*, 2020 U.S. Dist. LEXIS 250206, at *10 (D.N.J. Dec. 30, 2020)). The same principle applies to the FAC's new performance-based allegations.

9

Whether critiquing cost or performance, a complaint must compare the challenged investment to a like-kind alternative investment – a meaningful benchmark – available to the plan fiduciary at the time of the challenged conduct, which a prudent fiduciary acting under like circumstances would have selected. *See Opinion* at *15 (describing a meaningful benchmark as a "similarly-situated investment option"). A complaint does not clear this hurdle merely by alleging that cheaper investments with some similarities existed in the marketplace, or that another fund with a different performance strategy performed better. *See Young Cho v. Prudential Ins. Co. of Am.*, 2021 U.S. Dist. LEXIS 185397, at *25-26 (D.N.J. Sep. 27, 2021) (citing *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823-24 (8th Cir. 2018)). Under these well-established principles, the FAC's Investment Claim fails.

## A. Plaintiffs Again Fail to Plead Meaningful Benchmarks.

The FAC alleges that the T. Rowe Price and American Funds TDFs are meaningful benchmarks by which to gauge the prudence of the Nokia TDFs because they are of the same vintage. *See FAC*, ¶¶ 100, 105, 108. Plaintiffs' only other stated reason for selecting these comparators is that Morningstar, "the most well-respected and accepted financial industry database[,] places [them] in the Morningstar Lifetime Moderate Index category along with more than approximately 200 commercially available target date funds." *Id.*, ¶ 100. Plaintiffs do not explain why this matters. Instead, they allege generally that seven of the Plan's thirteen

TDFs were imprudent because they did not outperform the two handpicked comparator funds or the Morningstar Index. *Id*., ¶¶ 105, 106, Appendix A.

At the outset, Defendants note the disingenuousness of these allegations, at least with respect to the T. Rowe Price TDFs. In at least three other class actions, Plaintiffs' counsel has challenged fiduciaries' selection of these funds as *imprudent* because of their excessive costs. *See, e.g., Nunez v. B. Braun Med., Inc.,* 2023 U.S. Dist. LEXIS 145024 (E.D. Pa. Aug. 18, 2023); *Pinnell v. Teva Pharms. USA, Inc.,* 2020 U.S. Dist. LEXIS 55617 (E.D. Pa. Mar. 31, 2020); *Tobias v. Nvidia Corp.,* 2021 U.S. Dist. LEXIS 173539 (N.D. Cal. Sep. 13, 2021). Here, on the other hand, Plaintiffs' counsel extols the T. Rowe Price funds as a model of prudence. Such contradictory positions underscore the flexible standard of prudence plaintiffs' attorneys apply in these cookie-cutter class actions, depending on whether certain funds fit plaintiffs' narrative in a given case.

Substantively, Plaintiffs' allegations are implausible. As described above, TDFs are multi-asset funds, where the asset allocation – the "glide path" – is designed to become more conservative as the participant moves toward and through retirement. *See FAC*, ¶¶ 78-82. Plaintiffs *acknowledge* that asset allocation is a primary driver of performance. *See id.*, ¶¶ 82, 84. For example, a TDF weighted primarily in equities will generate different returns than a TDF more heavily

weighted in bonds.  *See Meiners*, 898 F.3d at 823 n.2.[3]  Similarly, given different market factors impacting U.S. and foreign markets, the weighting of U.S. and non-U.S. equities within a given fund will likewise impact performance.  *See In re Disney ERISA Litig.*, 2017 U.S. Dist. LEXIS 61202, *16 (C.D. Cal. Apr. 21, 2017); *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 315 (S.D.N.Y. 2018), *reversed and remanded in part on other grounds*, 9 F.4th 95 (2d Cir. 2021).

Because of differing asset allocations, a TDF offered by a different fund manager is not a meaningful benchmark to assess the prudence of a challenged TDF simply because it is of the same vintage.  *See Anderson v. Intel Cop. Inv. Policy Comm.*, 579 F. Supp. 3d 1133, 1150 (N.D. Cal. 2022).  A meaningful benchmark must have similar investment risks, aims, and rewards as the challenged funds.  *Id.* Pleading a meaningful benchmark also means providing information regarding funds' investment strategies, glide paths, and fees.  *See id.*  Comparing funds with different asset allocations and investment strategies is akin to comparing apples to oranges and is insufficient to demonstrate imprudence.  *See id.*; *see also Cho*, 2021

---

[3]     The FAC points out that some TDFs (known as "to" funds) are designed to become the *most* conservative immediately upon the target date, while others (known as "through" funds) are designed to be held past the target date and maintain exposure to equity investments so the participant may continue to accumulate savings.  *See id.*, ¶ 80.  Plainly, the glide paths, and thus the performance, of these two types of funds will differ materially.

U.S. Dist. LEXIS 185397, at *25 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the challenged funds were an imprudent choice at the outset.").

The FAC contains *zero* information about the similarities in asset allocations, glide paths, or investment strategies between the Nokia TDFs and the T. Rowe Price and American Funds comparators.  On that basis alone, the Investment Claim warrants dismissal.  However, based on judicially noticeable documents, it is clear that Plaintiffs' purported comparators are decidedly *noncomparable*.

The FAC focuses on the 2018-2020 investment period, and Plaintiffs use the 2040 vintage of the Nokia TDF as an illustrative example to prove their point.  *FAC*, ¶¶ 106, 109, Appendix A.  According to the glide path graphic and table published in the April 1, 2020 AFED, the equity (stock) allocation for the TDF with a target date twenty years out (i.e., the 2040 vintage) was 45% U.S. equities and 45% non-U.S. equities.  *Shapiro Cert.*, Ex. A (p. 18).[4]  By contrast, according to its 2020 fund

---

[4]     The 45% to 45% split between U.S. and non-U.S. equities derives from the "Fund Name" column on the AFED (located on page 18) and the percentages in the column marked "20 Years Until Retirement."  The 45% in U.S. equities is comprised of: the U.S. Small Cap Equity Fund (10.75%), the U.S. Large Cap Equity Index Fund (20.55%), the U.S. Large Cap Value Equity Fund (6.85%), and the U.S. Large Cap Growth Equity Fund (6.85%).  The 45% in non-U.S. equities is comprised of the Emerging Markets Equity Fund (11.25%) and the International Developed Markets Equity Funds (33.75%).

13

prospectus, the 2040 T. Rowe Price TDF had a target allocation of 58.02% U.S. equities and 24.87% non-U.S. equities. *Id.*, Ex. D (p. 4).[5] As for the 2040 American Funds TDF, the 2020 fund prospectus for this investment does not provide a breakdown of U.S. and non-U.S. equity holdings, nor does the FAC provide any information on its asset allocation targets. *See id.*, Ex. C.

However, public information regarding *current* glide paths and asset allocations confirms the same differences in splits between U.S. and non-U.S. equities between the Nokia TDFs and Plaintiffs' comparators. According to its Fund Fact Sheet, as of September 30, 2023, the 2040 vintage of the Nokia TDF consisted of 44.35% U.S. equities and 42.06% non-U.S. equities. *Id.*, Ex. E (p. 3).[6] According to Morningstar reports, as of September 30, 2023, the 2040 T. Rowe Price TDF

---

[5]    In 401(k) class actions of this sort, District Courts routinely take notice of public records such as Fund Fact Sheets, fund prospectuses, and information published by Morningstar, all of which is in the public domain. *See Anderson*, 579 F. Supp. 3d at 1144-45; *In re LinkedIn ERISA Litig.*, 2021 U.S. Dist. LEXIS 221294, at *15 (N.D. Cal. Nov. 16, 2021); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 U.S. Dist. LEXIS 160112, at *7 n.4 (S.D.N.Y. Sep. 18, 2019).

[6]    U.S. equity is itemized on page 3 of the Fund Fact Sheet as U.S. Large Cap Equity Index Fund (20.38%); U.S. Small Cap Equity Fund (10.36%); Large Cap Growth Equity Fund 1 (4.06%); Large Cap Value Equity Fund 2 (2.76%); Large Cap Growth Equity Fund 2 (2.72%); Large Cap Value Equity Fund 1 (2.70%); and Large Cap Value Equity Fund 3 (1.37%).

Non-U.S. equity is itemized as International Developed Markets Equity Fund 2 (15.98%); International Developed Markets Equity Fund 1 (15.89%); and Emerging Markets Equity Fund (10.19%).

consisted of 58.86% U.S. equites and 28.12% non-U.S. equities.  *Id*., Ex. G.

Similarly, as of September 30, 2023 the 2040 American Funds TDF consisted of

56.31% U.S. equity and 23.71%.  *Id*., Ex. F.   In sum, the equity holdings of the

Nokia TDFs are more evenly distributed between U.S. and non-U.S. equities,

whereas Plaintiffs' comparators are weighted in favor of U.S. equities.

The Morningstar Lifetime Moderate Index asset allocation is itself dissimilar

to the Nokia TDFs.  The aforementioned reports indicate (in the far column to the

right), that the present Morningstar Lifetime Moderate Index allocation for the 2040

target year is 49.12% U.S. equities and 29.46% non-U.S. equities.  *See id*., Exs. F-

G.

Further dissimilarities can be found in the allocation between stocks and

bonds/fixed income.  Presently, the 2040 Nokia TDF consists of 10.73% bonds.  *Id.*,

Ex. E (p. 4).  By contrast, the 2040 T. Rowe Price TDF consists of 7.84% bonds (*id.*,

Ex. G); the 2040 American Funds TDF consists of 13.94% bonds (*id.*, Ex. F); and

the Morningstar Lifetime Moderate Index for 2040 is allocated 20.89% to bonds (*id.*,

Ex. H).

With such markedly different asset allocations, performance of the Nokia

TDFs and the purported comparators will of course be different.  The FAC provides

no information as to how the allocations, strategies, aims, risks, or rewards of the

Nokia TDFs and the comparators are similar such that the comparators may be

considered meaningful benchmarks. District Courts have rejected similar allegations of fiduciary imprudence on motions to dismiss in similar contexts.

In *Anderson*, for example, plaintiffs challenged defendants' decision to allocate a significant portion of the assets of the plan's custom Intel TDFs to non-traditional investments (e.g., hedge funds and private equity). *Anderson*, 579 F. Supp. 3d at 1149. Plaintiffs alleged that the shift in asset allocation toward more non-traditional investments resulted in poor performance, an allegation plaintiffs tried to substantiate by comparing the Intel custom TDFs to: (1) published indices such as the S&P 500; (2) Morningstar "peer group categories;" and (3) peer alternatives within a given asset class. *Id.* Similar to what Plaintiffs allege here, plaintiffs in *Anderson* alleged that their proffered peer comparators were meaningful benchmarks because they were widely-recognized, well-respected funds in the industry. *See id*. at 1150.

The District Court rejected plaintiffs' allegations as implausible. Of significance was the complaint's failure to provide factual detail for how their chosen benchmarks – even if "common" or "well-respected in the industry" – had "similar aims, risks, and rewards" as the challenged TDFs. *See id.* Instead, the complaint provided "only generalizations or citations to generic TDF features," such as having a combination of asset classes and a glide path, without providing any specific details of the challenged TDFs' investment strategies or asset allocations.

16

*See id.*  The District Court found "especially conclusory" plaintiffs' allegations that peer TDFs of the same vintage are meaningful benchmarks, given the "considerable differences among TDFs offered by different providers, even among TDFs with the same target date."  *Id.*

The District Court also rejected plaintiffs' argument that Morningstar "peer group categories" are meaningful benchmarks.  Plaintiffs in this case make the same argument.  *See FAC*, ¶¶ 101, 105, 106, 109, 110 (all referencing Morningstar peer group categories).  The District Court in *Anderson* found that Morningstar peer group categories cannot be meaningful benchmarks because "the Morningstar peer group category is an average of a large group of TDFs," which tells a reviewing court nothing about the particular "aims, risks, or rewards of any individual fund" *within* the peer group.  *Anderson*, 579 F. Supp. 3d at 1150.  The District Court observed that, because of different asset allocations, *all* TDFs in a Morningstar peer group category could conceivably have different aims, risks, and rewards, making the peer group an inapt benchmark.  *See id.* at 1152.

The Eighth Circuit considered similar allegations in *Meiners*, a case on which this Court relied in the Opinion.  *See Opinion* at *16.  In *Meiners*, plaintiffs challenged the plan's selection and retention of a suite of Wells Fargo TDFs, alleging that those funds were more expensive than, and did not perform as well as, TDFs offered by Vanguard.  *See Meiners*, 898 F.3d at 821.

17

Affirming the District Court's dismissal of the complaint, the Eighth Circuit first observed that the Wells Fargo funds had a higher allocation of bonds than the Vanguard funds, which would necessarily impact performance.  *See id*. at 823 n.2. The court then held that "[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether Wells Fargo TDFs were an imprudent choice at the outset."  *Id*. at 823.  The court found that plaintiffs cannot "dodge the requirement for a meaningful benchmark by merely finding a less expensive alternative fund or two with some similarity."  *Id*.

While the FAC describes its purported comparators as well-respected and widely-used, it says nothing of their investment styles, asset allocations, investment aims, or risks.  On the one hand, Plaintiffs concede that asset allocation drives performance.  Yet, on the other hand, the FAC says nothing about how the asset allocations or other investment strategies of Plaintiffs' purported comparators make them "meaningful benchmarks" by which to gauge the prudence of the Nokia TDFs. Without a meaningful benchmark, the FAC's allegations fail and the Court must dismiss the Investment Claim.

**B.    Allegations of Isolated Periods of Underperformance are Insufficient to Demonstrate Imprudence.**

Even if Plaintiffs' purported comparators were meaningful benchmarks (and they are not), the FAC's allegations of underperformance improperly focus on

isolated snapshots in time.  That is, the FAC hones in on the performance of the challenged Nokia TDFs compared to Plaintiffs' purported benchmarks for the 2018, 2019, and 2020 calendar years only – less than half the Class Period.  *See FAC*, ¶¶ 106-107, Appendix A.  Once again, Plaintiffs' allegations are implausible.

Even if the Court accepts that the Nokia TDFs did not outperform the T. Rowe Price TDFs, the American Funds TDFs, or the Morningstar Lifetime Moderate Index during this isolated three-year period, general allegations of underperformance do not establish anything about whether the Nokia TDFs were imprudent from the outset or became imprudent over time.  *See Cho*, 2021 U.S. Dist. LEXIS 185397 at *27 (citing *Meiners*, 898 F.3d at 823).

To plead a plausible claim that a given investment was imprudent, a plaintiff must come forth with evidence to show that the investment "was imprudent from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the fund based on ongoing performance."  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022).  Merely pointing to another investment that has performed better in a short snapshot of the lifespan of a fund that is supposed to grow over fifty years is insufficient to plead imprudence.  *Id.*

The FAC's only meaningful effort to demonstrate deficient performance involves the 2040 Nokia TDF, the returns of which Plaintiffs purport to plot in a

chart in paragraph 106. First and foremost, the chart itself is indicative of nothing, as it contains full performance lines for the purported comparators, but only three data points for the 2040 Nokia TDF – one of which *matches* the Morningstar Lifetime Moderate Index performance line. But even if the Court accepts the chart at face value, at most it reflects that, at three isolated points in time, the 2040 Nokia TDF either matched or slightly underperformed the purported 2040 comparators. The chart says nothing about whether all seven challenged TDFs were imprudent from the beginning, or whether the TDFs became imprudent over time (or when).

The FAC also contains a troubling footnote describing the chart. In that footnote, Plaintiffs state that "[t]he total return methodology used in the chart…backs out expense as far as is practical." *FAC*, ¶ 108 n. 14. This statement is troubling because the TDF investment returns documented in the Plan's AFEDs are *net* of expenses, meaning they take expenses into consideration. *See Shapiro Cert.*, Exs. A-B (p. 11). But the footnote in paragraph 108 indicates that, for purposes of calculating and comparing returns, Plaintiffs "backed out" expenses – i.e., did not consider them. Disregarding Fund A's expenses and comparing its returns to Fund B *net* of expenses is akin to comparing gross income to net income – an apples-to-oranges juxtaposition.

But again, even accepting the chart at face value, it nonetheless fails to create a plausible inference that all seven challenged Nokia TDFs were imprudent.  Case law supports that conclusion.

Recently, in *Baumeister v. Exelon Corp.*, 2023 U.S. Dist. LEXIS 175326 (N.D. Ill. Sep. 29, 2023), plaintiffs challenged the fiduciaries' replacement of commercial TDFs offered by Vanguard with proprietary funds of defendants' own creation.  *Id*. at *10.  Plaintiffs alleged that the proprietary TDFs were imprudent because of their excessive fees and underperformance of the broader TDF market.  *See id*.  As in this case, plaintiffs in *Baumeister* compared the performance of the defendants' proprietary TDFs to commercial TDFs offered by T. Rowe Price and American Funds (and BlackRock).  *Id*. at *12.

The District Court granted defendants' motion to dismiss.  Even accepting plaintiffs' choice of comparators, the complaint failed to allege that defendants' proprietary TDFs were "materially out of step with the six other funds selected by Plaintiffs such that any reasonable fiduciary would have divested."  *Id*.  The comparative charts in plaintiffs' complaint illustrated only that the proprietary TDFs generally performed in the second or third quartiles compared to the broader TDF market.  *See id*. at *11.  As compared to the T. Rowe Price and American Funds benchmarks, while the complaint's charts reflected that certain vintages of the proprietary TDFs did indeed display poor performance, the District Court found that

21

the disparity was, on its own, insufficient to demonstrate imprudence. *See id*. at \*12-13.

The same logic applies here. The FAC's Appendix A alleges that during the three-year market cycle ending December 31, 2020, the Nokia TDFs underperformed the T. Rowe Price TDFs by roughly 1.7 to 4.00 percentage points; the American Funds TDFs by roughly 1.30 to 4.25 percentage points; and the Morningstar Index by roughly 0.50 to 1.90 percentage points. But the FAC provides no indication that the Nokia TDFs were so materially out of step with the broader market that a reasonable fiduciary would have divested. *See Baumeister*, 2023 U.S. Dist. LEXIS 175326 at \*12. On the contrary, Plaintiffs describe the Nokia TDFs' general performance as "mediocre at best." *FAC*, ¶ 105. If "mediocre" performance during a three-year time frame equals "imprudence," the boundaries of ERISA's fiduciary obligations would be stretched beyond recognition.

Dovetailing with the foregoing point, Plaintiffs allege that at various times during the Class Period, there were between 200 and 250 commercial TDFs included in Morningstar's "moderate" peer group. *FAC*, ¶¶ 105, 108 n.14. Plaintiffs contend that "more than 100" of these commercial TDFs would have been better choices than the Nokia TDFs. *Id*., ¶ 108. Stated in the converse, Plaintiffs acknowledge that the Nokia TDFs performed *better* than at least *half* of the "moderate" commercial TDFs on the market, placing them at or above the "median." Thus, even by Plaintiffs' own

flawed logic regarding the relevance of industry medians and averages (*see infra*), the Nokia TDFs were not imprudent.

Here, as in *Baumeister*, an honest comparison of the Nokia TDFs' performance to that of Plaintiffs' purported comparators fails to create a plausible inference that the Nokia TDFs was so out of step with the broader market that a prudent fiduciary would have divested.

**C.   The FAC's Allegations That the Nokia TDFs Should Have Been Replaced by or Supplemented With Commercial TDFs are Implausible.**

The FAC paints Nokia's proprietary TDFs as some type of shadow investment into which there is no real transparency, and suggests that, at a minimum, the Plan should have offered commercial TDFs as alternatives to the proprietary TDFs.  *See FAC*, ¶¶ 95-98, 109, 111.

First, Plaintiffs' contention is simply untrue.  As noted above, Nokia's TDFs are designed specifically for its Plan population by AllianceBernstein L.P., one of the industry's leading fund managers.  *See Shapiro Cert.*, Exs. A-B (p. 17).  Current information about the TDFs (and all Plan investments) is posted on Nokia's benefits website at https://www.benefitanswersplus.com/index.html, which is a public website for which no password is required.  In fact, Nokia's response to Plaintiffs' pre-litigation ERISA § 104(b)(4) request for documents (referenced in the *FAC* at paragraph 25) directed Plaintiffs' counsel to this website.  *Id.*, Ex. J.  The website

contains the most updated Fund Fact Sheets for all Plan investments, including the TDFs (*see* https://www.benefitanswersplus.com/FundFactSheets.html), as well as the fee and expense disclosures for all years of the Class Period (*see* https://www.benefitanswersplus.com/active_m/archives.html).

Second, contrary to Plaintiffs' allegations, there is nothing *per se* imprudent about proprietary TDFs.   In fact, Department of Labor guidance encourages fiduciaries to consider "whether a custom or non-proprietary target date fund would be a better fit for your plan" because of the "advantage[] to… participants by giving [fiduciaries] the ability to incorporate the plan's existing core funds in the TDF." *See* Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries, DOL/EBSA (February 2013), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf. Thus, to the extent the FAC alleges the Committee had a fiduciary obligation to use commercial TDFs over custom TDFs, or to offer commercial TDFs as alternatives to custom TDFs, that argument finds no support in the law.

As part and parcel of their suggestion that custom TDFs are *per se* imprudent, Plaintiffs criticize the Committee's use of composite benchmarks to track the performance of the Nokia TDFs, endeavoring to paint customized benchmarks as a proverbial thumb on the scale. *See FAC*, ¶¶ 108, 111.  Again, not so.  Custom benchmarks are a standard feature of all TDFs, designed to compare a TDF against

its own glide path.  In fact, in Section 318 of the SECURE 2.0 Act of 2022, enacted on December 29, 2022, Congress directed the Department of Labor to amend its regulations within two years to *require* fiduciaries to use custom benchmarks for TDFs in their annual fee-and-expense disclosures.  *See* Pub. L. 117-328, sec. 328. By contrast, current law only requires disclosure of a "broad-based securities market index."  *See* 29 C.F.R. § 2550.404a-5(d)(iii).  In enacting Section 318, Congress recognized that a "broad-based securities market index" is not necessarily helpful in measuring performance of TDFs because such an index does not take asset allocation into account.

At bottom, the use of custom benchmarks, by itself, does not constitute evidence of an imprudent process just because other benchmarks may have been available.  *See Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1293-94 (N.D. Ga. 2022).  As the Court explained in *Anderson*, composite benchmarks have the same asset allocation as the fund's target asset allocation.  *Anderson*, 579 F. Supp. 3d at 1151.  And in this case, as in *Anderson*, Plaintiffs do not allege that the Nokia TDFs performed worse than their customized benchmarks over time.  In fact, since their inception in 2011, the Nokia TDFs largely outperformed their custom benchmarks. *See Shapiro Cert.*, Ex A. (p. 11, reflecting performance as of December 31, 2020) and Ex. D (p. 5-6, reflecting performance as of September 30, 2023).

For the foregoing reasons, Plaintiffs' singular focus on the Nokia TDFs' alleged underperformance during a three-year snapshot in time is insufficient to state a claim for fiduciary imprudence.

### D.   The FAC's Criticisms of the Nokia TDFs' Performance Are Hindsight-Based.

"ERISA does not require clairvoyance on the part of plan fiduciaries, nor does it countenance opportunistic Monday morning quarter-backing on the part of lawyers and plan participants who, with the benefit of hindsight, have zeroed in on the underperformance of certain investment options." *Patterson v. Morgan Stanley,* 2019 U.S. Dist. LEXIS 174832, at *17 (S.D.N.Y. Oct. 7, 2019). Indeed, with the benefit of hindsight, it is *always* possible to show that some other fund performed better or cost less. *See, e.g., Lauderdale v. NFP Ret. Inc.*, 2021 U.S. Dist. LEXIS 164437, at *19 (C.D. Cal. Aug. 18, 2021) ("[T]here will always be certain investments that perform worse than others.").

Hindsight is the cornerstone of the FAC's performance allegations. Even a cursory review of the FAC reveals that after the Court issued the Opinion, Plaintiffs did nothing more than sift through historic performance charts and find two commercial TDFs out of hundreds that allegedly performed better than the Nokia TDFs during a three-year window. This Court rejected such hindsight-based

critiques in dismissing the Investment Claim the first time. *See Opinion* at *16. The same logic bars the Investment Claim's new allegations regarding performance.

### E. The FAC Regurgitates the Same Allegations of Excessive Costs Which the Court Rejected in the Opinion.

While the FAC's primary focus is on investment performance, it made no effort to change or augment the Original Complaint's allegations regarding investment costs. If anything, the FAC's new references to the comparator funds, in the context of performance, *weakens* Plaintiffs' allegations of excessive costs.

The FAC, like the Original Complaint, alleges that the expense ratios of the Nokia TDFs in 2020 exceeded ICI Profile medians and averages by trivial amounts – between two and five basis points above the median of 0.40%, and between five and nine basis points above the average of 0.37%. *FAC*, ¶ 69. Yet, according to its 2020 prospectus, the expense ratio of the 2040 T. Rowe Price TDF (Plaintiffs' preferred vintage) in that same year was an astounding ***0.69%***, significantly higher than the ICI Profile *and* the Nokia TDFs. *Shapiro Decl.*, Ex. D (p. 2).

Indeed, in *Pinnell*, in which Plaintiffs' counsel challenged the T. Rowe Price TDFs as imprudent based on excessive costs in relation to the ICI Profile, plaintiffs alleged that the 2035-2060 vintages of the T. Rowe Price TDFs (the same vintages Plaintiffs purport to use here as comparators) had expense rations in excess of 0.70%, "notably higher than the category median fee…reported by the Investment Company

Institute[.]"  *Pinnell*, 2020 U.S. Dist. LEXIS 55617, at *3.  Thus, by Plaintiffs' own logic, its proffered comparators are themselves imprudent.

In any event, the FAC proffers no comparator funds whose expenses may be compared to those of the Nokia TDFs.  Plaintiffs continue to cling to the ICI Profile as their *only* basis to allege that the expense ratios of the Nokia TDFs were excessive. *FAC*, ¶ 69.  But the Court has already concluded that the ICI Profile is not a meaningful benchmark for comparing investment costs.  *See Opinion* at *14-15.  The Court has also concluded that the excessiveness of a given investment's cost cannot be determined solely based on where it falls relative to a median or average – otherwise, by definition, half of all investments would be imprudent.  *See id*. at *16-17.[7]  These holdings are now the law of the case.

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *See Daramy v. AG of the United States*, 365 F. App'x 351, 354 (3d Cir. 2010).  And while a District Court has the power to revisit its own decisions, "as a rule courts should be loath to do so in the absence of extraordinary circumstances."  *Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 817

---

[7]     Several District Courts have drawn the same conclusion.  *See, e.g., Singh v. Deloitte LLP*, 2023 U.S. Dist. LEXIS 6910, at *18 (S.D.N.Y. Jan. 12, 2023); *Kendall v. Pharm. Prod. Dev., LLC*, 2021 U.S. Dist. LEXIS 61671, at *18 (E.D.N.C. Mar. 31, 2021).

(1988).  For purposes of the law of the case doctrine, extraordinary circumstances include situations in which (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create a manifest injustice.  *Bowers v. NCAA*, 563 F. Supp. 2d 508, 517 (D.N.J. 2008).

Again, the FAC's allegations of excessive costs are unchanged from the Original Complaint.  Plaintiffs' allegations of excessive costs rise or fall based on the ICI Profile.  The FAC contains no new factual allegations regarding the ICI Profile that might warrant the Court's revisiting its prior holding that the ICI Profile is not a meaningful benchmark.

Likewise, there has been no intervening change in the law.  Quite the opposite, since the Court issued the Opinion, the Tenth Circuit affirmed the dismissal of another 401(k) class action filed by Plaintiffs' counsel, holding that the ICI Profile "does not provide the meaningful benchmark necessary" to demonstrate imprudence because it "does not describe how the individual funds used in the ICI Study actually compare to the Plan's funds."  *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1155 (10th Cir. 2023).[8]  This Court drew a substantially similar conclusion earlier

---

[8]      As the Court will recall, the Investment Company Institute filed an *amicus* brief in *Barrick Gold* clarifying that the ICI Profile is *not* intended for benchmarking – a disclaimer expressly set forth in the document itself.  *See Shapiro Cert.*, Ex. I (p.

this year in a separate case rejecting the ICI Profile. *McCaffree Financial Corp. v. ADP, Inc.*, 2023 U.S. Dist. LEXIS 56362, at *48-49 (D.N.J. Mar. 31, 2023) (Salas, J.) ("[T]he Amended Complaint has failed to plead any facts showing that the total plan costs from the Brightscope/ICI study come from plans that have investment options that are similar to the Plan.").

In light of the foregoing, Plaintiffs cannot argue that the Court's decision to reject the ICI Profile as a meaningful benchmark was "clearly erroneous." Accordingly, Plaintiffs' allegations of excessive costs fail under the law of the case doctrine.

### F.    The Court's Opinion Bars the Investment Claim as a Whole.

The conclusions this Court drew in the Opinion apply with equal force whether the Court considers the Nokia TDFs' costs, performance, or both. Because hindsight is 20/20, in assessing a claim for fiduciary imprudence, the Court must look to process, not results, and apply a context-specific inquiry that takes into consideration the range of reasonable judgments a fiduciary may make based on his or her experience. *Opinion* at *11 (citations omitted).

The FAC is bereft of specific factual allegations from which the Court may infer an imprudent process. With respect to investment costs, the Court has already

---

1, 53).  Defendants brought the Institute's *amicus* brief to the Court's attention in a Notice of Supplemental Authority on November 14, 2022.  *See* Dkt. No. 29-1.

rejected the ICI Profile as a meaningful benchmark, and the law of the case doctrine prevents the Court from finding any plausibility in Plaintiffs' arguments.  With respect to investment performance, Plaintiffs have done nothing more than flag two allegedly better-performing commercial TDFs, without saying *anything* about their glide paths, investment strategies, or how they are similar to the Nokia TDFs.

Just as the Original Complaint did little more than allege that there were cheaper funds on the market, the FAC does little more than allege that there were two better performing funds on the market. *See Opinion* at * 15.  Such allegations are insufficient to support a plausible claim for imprudence and the Court must dismiss the Investment Claim.

### G.    The FAC's Derivative Cause of Action for Breach of the Duty to Monitor Fails as to the Investment Claim Because Plaintiffs Fail to Plead Breach of the Duty of Prudence.

A failure to monitor claim is a derivative theory of liability predicated on an underlying claim for breach of the duty of prudence. *See In re Allergan ERISA Litig.*, 975 F.3d 348, 354 (3d Cir. 2020).  "Without an underlying breach of an ERISA-imposed duty, a failure to monitor claim cannot proceed." *Opinion* at *44 (citing *In re Allergan*, 975 F.3d at 354 n.11).  Because the FAC fails to plead a plausible Investment Claim, and proffers no other independent facts to allege that Nokia or the Board failed to monitor the Committee, the Court must necessarily dismiss the

31

failure to monitor claim to the extent associated with the Investment Claim.  *See id.* at \*44-45.

### H.  The Court Should Dismiss the Investment Claim With Prejudice.

The Court has already granted Plaintiffs leave to amend the Investment Claim once, yet the FAC contains the same deficiencies as the Original Complaint. Plaintiffs are not entitled to yet another bite at the pleading apple.  The Court should therefore dismiss the Investment Claim with prejudice.  *See, e.g., Rhett v. New Jersey State Superior Court*, 260 F. App'x 513, 516 (3d Cir. 2008) (even taking into account plaintiff's pro se status, District Court did not abuse its discretion in dismissing second amended complaint with prejudice, in light of prior opportunities to cure pleading deficiencies).

## V.  <u>CONCLUSION.</u>

"ERISA…does not give the federal courts a broad license to second-guess the investment decisions of retirement plans."  *CommonSpirit*, 37 F.4th at 1162.  For the second time, Plaintiffs have couched their Investment Claim in factually and legally deficient allegations.  The same reasoning the Court applied when it dismissed the Investment Claim based on cost dooms the Investment Claim based on performance. The same result follows, and the Court should dismiss the Investment Claim *with* prejudice.

Respectfully submitted,
JACKSON LEWIS P.C.


/s/ *Howard Shapiro*
    *Michael E. Holzapfel*
    Howard Shapiro, Esq. (admitted *pro hac vice*)
    Michael E. Holzapfel, Esq. (031022002)

Dated: November 13, 2023

4871-7250-8560, v. 1

33